Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/20/2018 08:10 AM CDT

State of Nebraska, appellee, v.
James Cotton, appellant.
___ N.W.2d ___

Filed April 20, 2018.    No. S-17-196.

1. **Pleadings: Parties: Judgments: Appeal and Error.** A denial of a motion to sever will not be reversed unless clear prejudice and an abuse of discretion are shown, and an appellate court will find such an abuse only where the denial caused the defendant substantial prejudice amounting to a miscarriage of justice.

2. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

3. **Effectiveness of Counsel: Constitutional Law: Statutes: Records: Appeal and Error.** Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement. An appellate court determines as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance.

4. **Trial: Joinder.** There is no constitutional right to a separate trial.

5. **Trial: Joinder: Appeal and Error.** An appellate court reviews a trial court's determination on the joinability of offenses, under Neb. Rev. Stat. § 29-2002(1) (Reissue 2016), de novo. However, a misjoinder of

offenses is subject to a harmless error review and will not be reversed unless it resulted in prejudice.

6. **Trial: Joinder: Proof.** A defendant opposing joinder of charges has the burden of proving prejudice.

7. **Trial: Joinder.** Severe prejudice occurs when a defendant is deprived of an appreciable chance for an acquittal, a chance that the defendant would have had in a severed trial.

8. ____: ____. Prejudice is not shown if evidence of one charge would have been admissible in a separate trial of another charge.

9. **Pretrial Procedure: Motions to Suppress.** It is the intention of Neb. Rev. Stat. § 29-822 (Reissue 2016) that motions to suppress evidence are to be ruled on and finally determined before trial, unless the motion is within the exceptions contained in the statute.

10. **Motions to Suppress: Search and Seizure: Waiver.** Absent an exception, a failure to move for the suppression of evidence seized unlawfully waives the objection.

11. **Homicide: Convictions: Proof.** Under Neb. Rev. Stat. § 28-303 (Supp. 2017), the three elements which the State must prove beyond a reasonable doubt to obtain a conviction for first degree murder are as follows: The defendant (1) killed another person, (2) did so purposely, and (3) did so with deliberate and premeditated malice.

12. **Homicide: Intent: Time: Proof.** The premeditation element requires the State to prove that a defendant formed the intent to kill a victim without legal justification before doing so, but no particular length of time for premeditation is required. It is sufficient if an intent to kill is formed before the act is committed and not simultaneously with the act that caused the death.

13. **Homicide: Intent: Time.** Whether premeditation exists depends on numerous facts about how and what the defendant did prior to the actual killing which show he or she was engaged in activity directed toward the killing, that is, planning activity.

14. **Homicide: Intent: Juries.** A question of premeditation is for the jury to decide.

15. **Effectiveness of Counsel: Appeal and Error.** When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. Otherwise, the issue will be procedurally barred.

16. **Effectiveness of Counsel: Records: Appeal and Error.** The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. Such a claim may be resolved when the record on direct appeal is sufficient to either

affirmatively prove or rebut the merits of the claim. The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice, or that trial counsel's actions could not be justified as a part of any plausible trial strategy.

17. **Postconviction: Effectiveness of Counsel: Records: Claims: Appeal and Error.** In the case of an argument presented for the purpose of avoiding procedural bar to a future postconviction proceeding, appellate counsel must present a claim with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court. A claim insufficiently stated is no different than a claim not stated at all.

18. **Effectiveness of Counsel: Proof.** To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.

19. **Effectiveness of Counsel: Proof: Words and Phrases.** To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

20. **Constitutional Law: Criminal Law: Right to Counsel.** The Sixth Amendment to the U.S. Constitution provides that a criminal defendant has a right to have the assistance of counsel for his or her defense. An essential part of that right is the defendant's ability to select the counsel of his or her choice.

21. **Effectiveness of Counsel: Conflict of Interest.** The right to effective assistance of counsel entitles the accused to his or her counsel's undivided loyalties, free from conflicting interests.

22. **Trial: Conflict of Interest.** In the absence of an objection, the court has a duty to inquire into a potential conflict of interest only when the trial court knows or reasonably should know that a particular conflict exists.

23. **Right to Counsel: Conflict of Interest: Waiver.** A defendant can waive his or her right to assistance of counsel unhindered by a conflict of interest, provided that the waiver is knowing and intelligent, but a court is not required to accept a defendant's waiver in all circumstances.

24. **Right to Counsel: Conflict of Interest: Presumptions.** The right to counsel of choice is not absolute. A trial court must recognize a presumption in favor of a defendant's counsel of choice, but that

presumption may be overcome by a demonstration of actual conflict or a showing of a serious potential for conflict.

25. **Effectiveness of Counsel: Conflict of Interest: Proof.** A defendant who raised no objection at trial must show that an actual conflict of interest existed and that the conflict adversely affected his or her lawyer's performance. When an actual conflict exists, there is no need to show that the conflict resulted in actual prejudice to the defendant.

26. **Right to Counsel: Waiver: Appeal and Error.** There is no formalistic litany required to establish that a waiver was knowingly and intelligently made; instead, when considering whether a defendant voluntarily, knowingly, and intelligently waived his or her right to counsel, an appellate court reviews the totality of the circumstances appearing in the record.

27. **Constitutional Law: Waiver: Records.** A voluntary waiver, knowingly and intelligently made, must affirmatively appear from the record, before a court may conclude that a defendant has waived a right constitutionally guaranteed or granted by statute.

28. **Constitutional Law: Waiver: Appeal and Error.** In determining whether a defendant's waiver of a statutory or constitutional right was voluntary, knowing, and intelligent, an appellate court applies a clearly erroneous standard of review.

29. **Judgments: Appeal and Error.** Under a clearly erroneous standard of review, an appellate court does not reweigh the evidence, but the appellate court decides the ultimate question independent of the trial court's ruling.

30. **Constitutional Law: Right to Counsel: Attorneys at Law: Conflict of Interest.** When determining whether or not to disqualify a defense counsel, the court must balance two Sixth Amendment rights: (1) the defendant's right to be represented by counsel of choice and (2) his or her right to a defense conducted by an attorney who is free of conflicts of interest. The U.S. Supreme Court has also recognized an independent interest of the courts in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.

31. **Attorney and Client: Conflict of Interest.** Whether a conflict of interest justifies the disqualification of defense counsel is a matter committed to the discretion of the trial court.

32. **Trial: Attorney and Client: Conflict of Interest.** If a defense counsel acts or refrains from acting at trial in a manner that is inconsistent with the defendant's interests based on the preceding sources of conflicts, the defense counsel actively represents conflicting interests.

33. **Conflict of Interest.** The seriousness of any potential conflict of interest depends on its likelihood and dimensions.

34. **Courts: Attorneys at Law: Conflict of Interest.** When weighing the interests at stake, courts generally give substantial weight to defense counsel's representations regarding conflicts of interest.

35. **Criminal Law: Motions for Mistrial: Proof: Appeal and Error.** A mistrial is properly granted in a criminal case where an event occurs during the course of trial that is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial. The defendant must prove that the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice.

36. **Constitutional Law: Trial.** A defendant has fundamental constitutional right to a fair trial.

37. **Attorney and Client: Trial: Testimony: Waiver.** A defendant who has been fully informed of the constitutional right to testify may not acquiesce in his or her counsel's advice that he or she waive that right, and then later claim that he or she did not voluntarily waive such right.

38. **Trial: Prosecuting Attorneys: Motions for Mistrial: Proof.** When considering a claim of prosecutorial misconduct, an appellate court first considers whether the prosecutor's acts constitute misconduct and then considers whether the misconduct prejudiced the defendant's right to a fair trial. Before it is necessary to grant a mistrial for prosecutorial misconduct, the defendant must show that a substantial miscarriage of justice has actually occurred.

39. **Motions for Mistrial: Prosecuting Attorneys: Waiver: Appeal and Error.** A party who fails to make a timely motion for mistrial based on prosecutorial misconduct waives the right to assert on appeal that the court erred in not declaring a mistrial due to such prosecutorial misconduct.

40. **Trial: Prosecuting Attorneys: Appeal and Error.** When a defendant has not preserved a claim of prosecutorial misconduct for direct appeal, an appellate court will review the record only for plain error.

41. **Verdicts: Juries: Jury Instructions: Presumptions.** Absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at its verdict.

42. **Trial: Prosecuting Attorneys.** Public prosecutors are charged with the duty to conduct criminal trials in such a manner that the accused may have a fair and impartial trial.

43. **Trial: Prosecuting Attorneys: Words and Phrases.** Generally, prosecutorial misconduct encompasses conduct that violates legal or ethical standards for various contexts because the conduct will or may undermine a defendant's right to a fair trial.

44. **Trial: Prosecuting Attorneys: Evidence.** A prosecutor must base his or her argument on the evidence introduced at trial rather than on matters

not in evidence. When a prosecutor's comments rest on reasonably drawn inferences from the evidence, he or she is permitted to present a spirited summation that a defense theory is illogical or unsupported by the evidence and to highlight the relative believability of witnesses for the State and the defense.

45. **Trial: Prosecuting Attorneys: Juries.** A distinction exists between arguing that a defense strategy is intended to distract jurors from what the evidence shows, which is not misconduct, and arguing that a defense counsel is deceitful, which is misconduct.

46. **Trial: Prosecuting Attorneys.** In cases where the prosecutor comments on the theory of defense, the defendant's veracity, or the defendant's guilt, the prosecutor crosses the line into misconduct only if the prosecutor's comments are expressions of the prosecutor's personal beliefs rather than a summation of the evidence.

47. **Prosecuting Attorneys: Convictions: Juries.** It is as much a prosecutor's duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. Because the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed, improper suggestions, insinuations, and especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

48. **Trial: Prosecuting Attorneys: Appeal and Error.** In determining whether a prosecutor's improper conduct prejudiced the defendant's right to a fair trial, an appellate court considers the following factors: (1) the degree to which the prosecutor's conduct or remarks tended to mislead or unduly influence the jury; (2) whether the conduct or remarks were extensive or isolated; (3) whether defense counsel invited the remarks; (4) whether the court provided a curative instruction; and (5) the strength of the evidence supporting the conviction.

Appeal from the District Court for Douglas County: GARY B. RANDALL, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Matthias J. Kraemer for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, and FUNKE, JJ.

Funke, J.

This is James Cotton's direct appeal of his jury convictions and sentences for first degree murder, use of a deadly weapon to commit a felony, possession of a deadly weapon by a prohibited person, and possession of a controlled substance. Cotton filed a timely appeal, and he proceeds with different counsel than at trial. We affirm his convictions.

## I. BACKGROUND

On August 7, 2015, Cotton shot and killed Trevor Bare. During the evening prior to the shooting, Bare saw Cotton in the apartment immediately above his own. Because Cotton and Bare had a negative history together, Bare confronted Cotton and an argument ensued. After the initial altercation, Bare and his girlfriend, McKayla Burnette, left the apartment house. A couple of hours later, someone set a fire in the back of the truck owned by Travis Labno, the new tenant of the apartment immediately above Bare's.

Around 6:30 a.m. on August 7, 2015, Bare and Burnette returned to Bare's apartment. Upon their return, Labno confronted Bare outside the house about the fire, while Cotton exited Labno's apartment with a shotgun. After the argument between Labno and Bare ended, Cotton and Bare commenced an argument, which ended with Cotton's shooting Bare. Bare died from his injuries.

At the crime scene, police found a broken piece of fence wood on the ground, a spent shotgun casing, and a bloodstain on the ground approximately 6 to 10 feet from the porch. They also recovered a sawed-off shotgun in the bushes behind a nearby house, which shotgun was later identified as the murder weapon.

A search warrant was obtained for Labno's apartment. During the execution of the warrant, police discovered the following: in the bathroom, marijuana on top of the toilet, a bag in the toilet bowl, and a glass pipe in the sink; in the kitchen, a broken "meth pipe or crack pipe"; and, in the northwest bedroom closet, two envelopes with Cotton's name on them,

a medication bottle with Cotton's name on it, an unlabeled medication bottle containing marijuana, a spoon, a syringe, and a tin that contained methamphetamine.

The cause of Bare's death was determined to be a shotgun wound to the abdomen. Autopsy results revealed that he had methamphetamine, amphetamine, and "THC" in his system. The autopsy also revealed the presence of fentanyl, which was administered to him after the shooting.

At trial, Burnette testified that she and Bare saw Cotton as they were leaving their apartment at approximately midnight on August 6, 2015. Burnette said Bare was angry about Cotton's presence, so Bare approached Labno's apartment and knocked on the door. Burnette stated that she waited about 10 minutes before approaching Labno's apartment to see what was happening. When she did, she heard Bare say that "[t]his is my block" and that Cotton could not stay there. Burnette testified that she grabbed Bare and pushed him back toward their car and that as they were leaving, Cotton called Bare a "pussy."

Burnette stated that after leaving the apartment, they went to Bare's mother's house where they used marijuana and methamphetamine. At around 6:30 a.m., Bare and Burnette returned to Bare's apartment. When they got there, they saw Labno run into his apartment. While in the apartment, Burnette said she could hear Cotton and Labno talking and recognized Cotton's voice from the earlier argument. She stated that she heard Cotton say, "'I have a round in the gun and I'm going to use it.'" Burnette told Bare what she heard just before she heard the sound of footsteps upstairs running outside, at which point, Bare went outside as well.

Burnette said that after hearing a "smack" outside, she went to the screen door to see what was happening. She testified that she saw Bare holding a piece of wood, Labno by the porch, and Cotton sitting in a chair on the porch behind Labno with a shotgun in his lap, which he was pointing at Bare. Burnette testified that Labno and Bare were arguing at first, but then the argument between them seemed to calm down. Burnette stated

that Cotton then stood up and started arguing with Bare, who still had the piece of wood in his hand. She stated that Bare stepped toward Cotton and said, "[I]f you're going to hold the gun to me, then you better fucking shoot me," at which point, Cotton shot Bare.

Labno testified that on August 6, 2015, Cotton was helping him move into his new apartment and that Cotton was planning on staying with him for a while. According to Labno, Cotton woke him up during the night to tell him Bare and Burnette had set fire to his truck. After looking at the truck, Labno stated that he went back to bed. Cotton's trial counsel, however, introduced Labno's cell phone records, which showed that Labno's cell phone made a number of calls around 4 a.m. from an area away from his apartment. Additionally, in a portion of Labno's deposition testimony that was read into evidence, Labno invoked his right to remain silent in response to a question regarding whether he left his apartment and returned with a shotgun, after which the prosecutor said that "we'll talk about immunity as it relates to the gun."

Labno further testified that as he was getting ready for work the next morning, he saw Bare and Burnette pull into the driveway in two vehicles, blocking his vehicle in the driveway. Labno stated that he yelled out to Cotton that Bare was back and then went out to confront Bare, who had a board in his hand. Labno told Bare to drop the board so they could fight, but Bare refused. Labno testified that he heard a "clack" after his argument had deescalated and turned around to see Cotton holding a shotgun. He stated that Cotton and Bare began arguing at that point, from a distance of about 6 to 8 feet apart, and that the argument then escalated and Cotton shot Bare. Labno testified that their argument lasted about 5 minutes and that Bare was acting "totally crazy" and did not seem like he was going to back down. Labno testified that he was not watching the fight and was unsure if Bare advanced at Cotton, but he stated that Bare did not charge him. However, he did state that just before the shooting, Bare said something like, "If you pull a gun, you better use it . . . ."

Cotton testified at trial and admitted that he shot Bare but claimed that he did so in self-defense. He alleged that Labno obtained the shotgun and brought it to the altercation with Bare. Cotton stated that he grabbed the shotgun only after Bare had hit him with a wooden board and was advancing at him again with the board.

Cotton also testified that Bare and Bare's mother used to live with him. However, issues arose because Bare and his mother were stealing things from Cotton and Bare was causing problems in the neighborhood—yelling at children and flashing a gun in Cotton's garage. Cotton evicted Bare and his mother, but Bare continued to drive through the neighborhood and would occasionally stop in front of Cotton's house. Cotton eventually moved out of that residence and was staying in a hotel on August 6, 2015.

Cotton stated that he stayed at Labno's apartment that night at Labno's request. Cotton also testified that at 2:30 a.m., Bare was knocking on Labno's door, and that when Cotton answered the door, he told Bare to leave. When Bare refused to leave, Cotton said he got Labno and then went back to the bedroom. Cotton heard Bare tell Labno "this is my block" and that Labno slammed the door in Bare's face. Cotton and Labno testified that Bare threatened Labno and told him, "I'll be back, ask [Cotton] what I'll do," as he left with Burnette.

Around 4 a.m., he saw a bright light outside and saw Bare and Burnette lighting Labno's truck on fire. Cotton testified that Labno was not at his apartment at that time, so he went outside and put out the fire himself. Further, he stated that when Labno returned, Labno called his friend, Jeff Faye, and then left and returned with a shotgun.

Cotton stated that later that morning while he was trying to sleep, Labno yelled out, "They're here." He said that Labno went and got the shotgun, "rack[ed] it," and said, "There's one in the chamber" and tried to hand the gun to Cotton. Cotton said he refused to take the gun and told Labno to "take care of your business like a man." Labno said, "I'm going to

get the son of a bitch for doing this" and went outside with the shotgun.

Cotton testified that Bare came to Labno's front door and that a confrontation ensued. Cotton stated that he went outside and tried to leave but could not because his vehicle was blocked in. He heard Bare yelling at Labno, and when he got to the side of the house, Labno had the shotgun in his left hand and Bare was holding a board. He stated that as the argument escalated, Bare swung the board at him in a "karate chop" motion. Cotton said the board hit him in the hand, jamming one of his fingers and giving him a splinter. Cotton said that he tried to leave to remove the splinter but that Bare said, "You ain't going nowhere old mother-fucker, sit down in that chair or I'll split your head," at which point Labno pointed the shotgun at Bare and told him to back up.

Cotton stated that Bare was still in a rage after his argument with Labno ended and started yelling at Cotton about money that Bare thought Cotton owed him. He said that Bare came up toward the porch and told Cotton, "There's a gun there, you punk mother-fucker, you better use it." Then Bare started coming toward Cotton, so he grabbed the gun and shot Bare. He said that he tried to hit Bare in the legs and was not "aiming to kill the kid."

Matthew Krisel, a friend of Bare, testified that after the shooting, he got a telephone call about Bare's death. Krisel immediately called Cotton to ask him what had happened, and Cotton asked Krisel to bring him some "dope," which, according to Krisel, meant methamphetamine. Cotton also asked Krisel if he had heard that Cotton and Labno were "on the lamb because they shot a kid and he was in critical condition." Cotton told Krisel where he was, and Krisel relayed that location to police. The police apprehended Cotton at a nearby residence.

During his trial testimony, Krisel acknowledged that he was testifying against Cotton pursuant to a proffer agreement with the State and was seeking leniency on his own charges in a

separate case. Cotton denied having a conversation with Krisel after the shooting and said that he never asked Krisel to bring him some "dope."

While Cotton was in jail, he made recorded telephone calls to Labno and Faye. During a call to Labno, on August 26, 2015, Cotton asked Labno if he had received Cotton's letters and asked Labno if he has "any violence on [his] record" because he was "just wonderin' on something." Labno testified that he thought Cotton was trying to set him up to take the gun charge.

During the call to Faye, on August 28, 2015, Faye told Cotton that Labno was upset because it appeared Cotton wanted Labno to take the blame for having the shotgun. Cotton said he was "all wound up" and did not recall exactly what he said in his letters to Labno. Cotton said he was just trying to exonerate himself on the gun charge. Cotton also said, "I was out of my mind that day, I was in a heightened thing," and told Faye that he would be testifying that he had acted in self-defense. Faye testified that he believed Cotton was using methamphetamine at the time of the incident.

Cotton called two of his former neighbors as witnesses to testify about Bare's conduct while living with Cotton. The first witness testified that Bare often acted like a tough guy, kind of like a "gangster," and was abusive toward people he was with and was confrontational toward neighbors. The second witness stated that Bare was somewhat aggressive and that he had seen Bare with a sidearm. He said that Cotton had contacted him once about getting Bare out of his house. Both of Cotton's former neighbors also testified that they were aware that Cotton used methamphetamine and other drugs while he lived in their neighborhood.

At the close of the State's case in chief, Cotton filed a motion to dismiss for lack of sufficient evidence, which was denied. After closing augments, Cotton renewed his motion to dismiss and requested a directed verdict for the defense, which was overruled.

The jury found Cotton guilty as charged on all four counts. Cotton filed a motion for new trial, which was denied. In October 2016, the court appointed Cotton new counsel from the Douglas County public defender's office.

In January 2017, Cotton was sentenced to life in prison on count I (first degree murder), 5 to 20 years' imprisonment on count II (use of a deadly weapon to commit a felony), 3 to 20 years' imprisonment on count III (felon in possession of a deadly weapon), and 20 months' to 2 years' imprisonment on count IV (possession of a controlled substance). All four sentences were ordered to run consecutively. Cotton perfected a timely appeal.

## II. ASSIGNMENTS OF ERROR

Cotton presents 11 assignments of error, restated and reordered, on appeal. He assigns that the court erred in (1) denying his motion to sever count IV from the amended information, (2) admitting evidence obtained in a search that went beyond the scope of the warrant, (3) finding his conviction of first degree murder was supported by competent evidence, and (4) denying his motion for new trial based on prosecutorial misconduct.

Cotton also assigns that his trial counsel was ineffective in (5) failing to withdraw due to a conflict of interest, (6) failing to call Lindsey Redinbaugh as a witness, (7) failing to request a mistrial when Labno testified at trial after having been declared unavailable and had his deposition read into the record, (8) failing to object to improper questioning by the State and instances of prosecutorial misconduct during closing argument, (9) failing to cross-examine Dr. Erin Linde, and (10) offering the deposition of Faye at trial, as well as (11) issues raised by him during allocution at his sentencing hearing.

## III. STANDARD OF REVIEW

[1] A denial of a motion to sever will not be reversed unless clear prejudice and an abuse of discretion are shown, and an

appellate court will find such an abuse only where the denial caused the defendant substantial prejudice amounting to a miscarriage of justice.[1]

[2] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[2]

[3] Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement. We determine as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance.[3]

## IV. ANALYSIS

### 1. Motion to Sever Count IV and Court's Admission of Drug Evidence

#### (a) Additional Facts

About 1 month before trial, Cotton filed a motion to suppress regarding physical evidence obtained from him during a police interview, the shotgun used to kill Bare, and any evidence of his use of the shotgun, which the court overruled.

---

[1] *State v. Henry*, 292 Neb. 834, 875 N.W.2d 374 (2016).

[2] *State v. Mendez-Osorio*, 297 Neb. 520, 900 N.W.2d 776 (2017).

[3] *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017).

Four days before trial, the State filed an amended information adding count IV, possession of a controlled substance (methamphetamine). That same day, Cotton filed a motion in limine and sought to preclude the State from adducing any evidence regarding the methamphetamine found inside Labno's apartment. Cotton's motion alleged that there was no reliable basis to conclude that the methamphetamine belonged to Cotton, so the introduction of that evidence would violate Neb. Evid. R. 104, 402, 403, and 404.

At the hearing, the police officer who executed the search warrant testified that police had discovered, in the northwest bedroom closet, two envelopes with Cotton's name on them and a medication bottle with Cotton's name on it. Additionally, he stated that a tin containing methamphetamine was also found in that closet. The district court found there was probable cause to believe that Cotton committed the crime of possession of methamphetamine and bound over the charge for trial.

Also at the hearing, Cotton moved to sever count IV, arguing that it would allow otherwise inadmissible evidence to be presented at trial. The court overruled both Cotton's motion in limine, to exclude drug evidence, and his motion to sever.

At trial, Cotton's counsel objected to an officer's testimony about the items recovered during the execution of the search warrant on Fourth Amendment grounds.

### (b) Cotton Was Not Prejudiced
### by Joinder of Count IV

Cotton assigns that the court erred in overruling his motion to sever count IV from the amended information. He argues that count IV was not related or joinable to counts I, II, and III, because the murder and weapon charges were different in nature from the drug charge and could be proved without any reference to the drug charge. Cotton asserts that he was severely prejudiced by the joinder of count IV, because it permitted the State to admit propensity evidence of drug use

that the jury could not have otherwise considered to attack his character.

[4] There is no constitutional right to a separate trial.[4] Instead, the joinder or separation of charges for trial is governed by Neb. Rev. Stat. § 29-2002 (Reissue 2016), which states, in relevant part:

> (1) Two or more offenses may be charged in the same indictment, information, or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
>
> . . . .
>
> (3) If it appears that a defendant or the state would be prejudiced by a joinder of offenses in an indictment, information, or complaint . . . the court may order an election for separate trials of counts, indictments, informations, or complaints, grant a severance of defendants, or provide whatever other relief justice requires.

Under § 29-2002, whether offenses were properly joined involves a two-stage analysis: (1) whether the offenses were related and joinable, under subsection (1), and (2) whether the joinder was prejudicial to the defendant, under subsection (3).[5] There is a strong presumption against severing properly joined counts under § 29-2002(3).[6]

[5] We have stated that § 29-2002(1) is similar to the federal rule for joinder, found in Fed. R. Crim. P. 8(a) and (b); so, federal case law is instructive to our application § 29-2002(1).[7] Thus, we review a trial court's determination on the joinability

_____

[4] *State v. Stevens*, 290 Neb. 460, 860 N.W.2d 717 (2015).

[5] See *Henry, supra* note 1.

[6] *State v. Knutson*, 288 Neb. 823, 852 N.W.2d 307 (2014).

[7] See *State v. Foster*, 286 Neb. 826, 839 N.W.2d 783 (2013).

of offenses, under § 29-2002(1), de novo.[8] However, a misjoinder of offenses is subject to a harmless error review and will not be reversed unless it resulted in prejudice.[9]

[6] Accordingly, while subsections (1) and (3) of § 29-2002 "present different questions, it is clear that there is no error under either [subsection] if joinder was not prejudicial."[10] Therefore, a denial of a motion to sever will not be reversed unless clear prejudice and an abuse of discretion are shown, and an appellate court will find such an abuse only where the denial caused the defendant substantial prejudice amounting to a miscarriage of justice.[11] A defendant opposing joinder of charges has the burden of proving prejudice.[12]

[7,8] To prevail on a severance argument, a defendant must show compelling, specific, and actual prejudice from the court's refusal to grant the motion to sever.[13] Severe prejudice occurs when a defendant is deprived of an appreciable chance for an acquittal, a chance that the defendant would have had in a severed trial.[14] However, prejudice is not shown if evidence of one charge would have been admissible in a separate trial of another charge.[15]

Here, we need not consider whether count IV was properly joined with the other counts, because Cotton cannot show any prejudice from the joinder. At trial, Cotton presented self-defense as an affirmative defense. To successfully assert

---

[8] See, *U.S. v. Zimny*, 873 F.3d 38 (1st Cir. 2017); *U.S. v. Litwok*, 678 F.3d 208 (2d Cir. 2012); *U.S. v. Colonna*, 360 F.3d 1169 (10th Cir. 2004), *overruled on other grounds, U.S. v. Little*, 829 F.3d 1177 (10th Cir. 2016).

[9] See, e.g., *Zimny, supra* note 8.

[10] *U.S. v. Prigge*, 830 F.3d 1094, 1098 (9th Cir. 2016), *cert. denied* ___ U.S. ___, 137 S. Ct. 697, 196 L. Ed. 2d 573 (2017). See *Foster, supra* 7.

[11] *Henry, supra* note 1.

[12] *Id.*

[13] *Stevens, supra* note 4.

[14] *Foster, supra* note 7.

[15] *Stevens, supra* note 4.

a claim of self-defense, one must have a reasonable and good faith belief in the necessity of using such force.[16] Thus, whether Cotton was under the influence of alcohol or drugs at the time of the shooting was relevant to determining if he had a reasonable subjective belief that his use of force was necessary.

Accordingly, the evidence of count IV would have been admissible at trial even if the count would have been severed from the amended information. Therefore, this assignment of error is without merit.

### (c) Cotton Waived Right to Object
### to Lawfulness of Seizure
### of Methamphetamine

Cotton argues that the court erred in denying his motion to suppress, because the State exceeded the search warrant—limited to firearms, companion equipment, and ammunition—when it seized the methamphetamine from Labno's apartment.

The State contends that this assignment of error is not properly before this court, because Cotton's motion to suppress made no mention of methamphetamine or drug paraphernalia and he never filed an additional motion to suppress or expanded his initial motion.

Neb. Rev. Stat. § 29-822 (Reissue 2016) provides, in relevant part, the following:

> Any person aggrieved by an unlawful search and seizure may move for return of the property so seized and to suppress its use as evidence. The motion shall be filed in the district court where a felony is charged and may be made at any time after the information or indictment is filed, and must be filed at least ten days before trial or at the time of arraignment, whichever is the later, unless otherwise permitted by the court for good cause shown. . . . Unless claims of unlawful search and seizure

---

[16] *State v. Smith*, 284 Neb. 636, 822 N.W.2d 401 (2012).

are raised by motion before trial as herein provided, all objections to use of the property as evidence on the ground that it was obtained by an unlawful search and seizure shall be deemed waived; *Provided,* that the court may entertain such motions to suppress after the commencement of trial where the defendant is surprised by the possession of such evidence by the state, and also may in its discretion then entertain the motion where the defendant was not aware of the grounds for the motion before commencement of the trial.

[9,10] A suppression hearing is preparatory, because it relates to auxiliary issues not immediately relevant to the question of guilt and is held in anticipation of certain evidence being introduced at a forthcoming trial.[17] It is the intention of § 29-822 that motions to suppress evidence are to be ruled on and finally determined before trial, unless the motion is within the exceptions contained in the statute.[18] Accordingly, absent an exception, a failure to move for the suppression of evidence seized unlawfully waives the objection.[19]

As the State argues, Cotton's motion to suppress did not make any mention of the methamphetamine or other drugs and drug paraphernalia seized during the search of Labno's apartment. While Cotton would have had cause to file a new motion to suppress or amend his previous motion less than 10 days prior to trial, as a response to the State's amended information, he did not do so. Instead, he filed a motion in limine to exclude methamphetamine evidence on the basis of evidence rules 104, 402, 403, and 404—not Fourth Amendment grounds. While he did make a Fourth Amendment objection to the evidence at trial, he did not make a motion to suppress and the court would have had no basis to apply the

---

[17] *State v. Piper*, 289 Neb. 364, 855 N.W.2d 1 (2014), citing Wayne R. LaFave et al., Criminal Procedure § 10.1 (5th ed. 2009).

[18] *Piper, supra* note 17.

[19] *State v. Howell*, 188 Neb. 687, 199 N.W.2d 21 (1972).

statutory exception for surprise when the objection concerned the exact evidence which was the subject of Cotton's motion in limine.

We conclude that Cotton waived his right to object to the seizure's lawfulness by failing to move for the suppression of the evidence. Thus, this assignment of error is without merit.

## 2. EVIDENCE WAS SUFFICIENT TO SUPPORT COTTON'S CONVICTION

Cotton argues that the evidence was insufficient as a matter of law to support a guilty verdict of first degree murder, because the State failed to prove that he acted with deliberate or premediated malice. Instead, he argues that the evidence clearly shows that he acted instinctively in self-defense.

The State argues that the jury was properly instructed on the elements of first degree murder, its burden, and Cotton's claim of self-defense. It argues that while the evidence supporting the conviction was disputed, we must view it in the light most favorable to the State, and that matters of weight and credibility are for the jury to decide.

[11] Pursuant to Neb. Rev. Stat. § 28-303 (Supp. 2017), a person commits murder in the first degree if he or she kills another person purposely and with deliberate and premeditated malice. We have summarized the three elements which the State must prove beyond a reasonable doubt to obtain a conviction for first degree murder as follows: The defendant (1) killed another person, (2) did so purposely, and (3) did so with deliberate and premeditated malice.[20]

With respect to the element of "deliberate and premeditated malice," under § 28-303, our cases commonly look to the facts showing the planning of a murder and the manner in which the murder was carried out.[21] Specifically, the deliberation element means not suddenly or rashly, and requires the State to prove

---

[20] *State v. Escamilla*, 291 Neb. 181, 864 N.W.2d 376 (2015).

[21] *Id.*

that the defendant considered the probable consequences of his act before committing it.[22]

[12-14] The premeditation element requires the State to prove that a defendant formed the intent to kill a victim without legal justification before doing so, but no particular length of time for premeditation is required.[23] It is sufficient if an intent to kill is formed before the act is committed and not simultaneously with the act that caused the death.[24] The time required to establish premeditation may be of the shortest possible duration and may be so short that it is instantaneous, and the design or purpose to kill may be formed upon premeditation and deliberation at any moment before the homicide is committed.[25] Whether premeditation exists depends on numerous facts about how and what the defendant did prior to the actual killing which show he or she was engaged in activity directed toward the killing, that is, planning activity.[26] A question of premeditation is for the jury to decide.[27]

Burnette testified that after she and Bare returned to Bare's apartment, she heard Cotton say, "'I have a round in the gun and I'm going to use it.'" Then, she stated that when she looked outside during the altercation, she saw Bare holding a piece of wood, Labno by the porch, and Cotton sitting in a chair on the porch behind Labno with a shotgun pointed at Bare in his lap. While the altercation was between Labno and Bare initially, Burnette stated that Cotton became upset when their argument deescalated and that Cotton went into Labno's apartment. She testified that when Cotton reemerged from the apartment, he placed himself in between Labno and Bare, still with the gun. Bare then stepped toward Cotton and said, "[I]f

[22] *State v. Braesch*, 292 Neb. 930, 874 N.W.2d 874 (2016).

[23] *Id.* See, also, *Escamilla, supra* note 20.

[24] *Braesch, supra* note 22.

[25] *Escamilla, supra* note 20.

[26] *Id.*

[27] *Id*.

you're going to hold the gun to me, then you better fucking shoot me," at which point Cotton shot Bare.

Cotton admitted to shooting Bare and to doing so purposefully. While Cotton presented a different version of events and claimed his actions were in self-defense, we must view the evidence in the light most favorable to the State. Based on Burnette's testimony, there was sufficient evidence for a jury to conclude that Cotton went outside with the shotgun and injected himself into the argument between Labno and Bare with deliberate and premeditated malice to kill Bare. Therefore, this assignment of error is without merit.

### 3. INEFFECTIVE ASSISTANCE
#### OF COUNSEL

[15] When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. Otherwise, the issue will be procedurally barred.[28]

[16] However, the fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved.[29] Such a claim may be resolved when the record on direct appeal is sufficient to either affirmatively prove or rebut the merits of the claim.[30] The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice, or that trial counsel's actions could not be justified as a part of any plausible trial strategy.[31]

[17] In the case of an argument presented for the purpose of avoiding procedural bar to a future postconviction proceeding, appellate counsel must present a claim with enough

---

[28] *State v. Jedlicka*, 297 Neb. 276, 900 N.W.2d 454 (2017).

[29] *Id.*

[30] *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014).

[31] See *id.*

particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court.[32] A claim insufficiently stated is no different than a claim not stated at all.[33]

[18,19] To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*,[34] the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.[35] To show deficient performance, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.[36] To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.[37] A reasonable probability is a probability sufficient to undermine confidence in the outcome.[38] The two prongs of this test may be addressed in either order, and the entire ineffectiveness analysis should be viewed with a strong presumption that counsel's actions were reasonable.[39]

### (a) Cotton Waived Right to Counsel Free of Conflict of Interest

Cotton contends that his trial counsel was ineffective for failing to file a motion to withdraw, because his trial counsel

---

[32] *State v. Mendez-Osorio, supra* note 2.

[33] *State v. Mora*, 298 Neb. 185, 903 N.W.2d 244 (2017).

[34] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[35] *Burries, supra* note 3.

[36] *State v. Duncan*, 293 Neb. 359, 878 N.W.2d 363 (2016).

[37] See *Burries, supra* note 3.

[38] *State v. Williams*, 295 Neb. 575, 889 N.W.2d 99 (2017).

[39] *Jedlicka, supra* note 28.

had a conflict of interest. He also asserts that his waiver of the conflict of interest was not effective, because it was not a signed writing and his trial counsel could not have given him detached advice when the conflict of interest was a personal conflict of Cotton's trial counsel.

The State argues that Cotton's affirmative waiver of his trial counsel's conflict of interest on the record was knowing and intelligent and that there was a strong presumption toward allowing Cotton to choose his own counsel, so the court did not err in accepting his waiver.

[20] The Sixth Amendment to the U.S. Constitution provides that a criminal defendant has a right to have the assistance of counsel for his or her defense. An essential part of that right is the defendant's ability to select the counsel of his or her choice.[40] In general, defendants are free to employ counsel of their own choice and the courts are afforded little leeway in interfering with that choice.[41] Accordingly, because disqualification of a criminal defendant's chosen counsel raises problems of a constitutional dimension, it is a harsh remedy that should be invoked infrequently.[42]

The Sixth Amendment also recognizes a presumption in favor of the defendant's chosen counsel.[43] Among the reasons for this presumption are (1) a historic respect for the defendant's autonomy in crafting a defense, (2) the strategic importance of choice in ensuring vigorous advocacy, and (3) practical considerations of costs to the defendant and the judicial system if counsel of choice were wrongly denied.[44]

[21,22] But the right to effective assistance of counsel also entitles the accused to his or her counsel's undivided loyalties,

---

[40] *State v. Kawa*, 270 Neb. 992, 708 N.W.2d 662 (2006), *overruled on other grounds, Heckman v. Marchio*, 296 Neb. 458, 894 N.W.2d 296 (2017).

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] *Id.*

free from conflicting interests.[45] In the absence of an objection, the court has a duty to inquire into a potential conflict of interest only when the trial court knows or reasonably should know that a particular conflict exists—which is not to be confused with a situation in which the trial court is aware of a vague, unspecified conflict of interest, such as that which inures in almost every instance of multiple representation.[46]

[23,24] A defendant can waive his or her right to assistance of counsel unhindered by a conflict of interest, provided that the waiver is knowing and intelligent, but a court is not required to accept a defendant's waiver in all circumstances.[47] The right to counsel of choice is not absolute. A trial court must recognize a presumption in favor of a defendant's counsel of choice, but that presumption may be overcome by a demonstration of actual conflict or a showing of a serious potential for conflict.[48] Disqualification in such cases is necessary, because when a defendant is represented by an attorney who has an actual or potentially serious conflict, the defendant may be deprived of effective assistance of counsel.[49]

[25] A defendant who raised no objection at trial must show that an actual conflict of interest existed and that the conflict adversely affected his or her lawyer's performance.[50] When an actual conflict exists, there is no need to show that the conflict resulted in actual prejudice to the defendant. If the defendant shows that his or her defense counsel faced a situation in which conflicting loyalties pointed in opposite

---

[45] *State v. Edwards*, 284 Neb. 382, 821 N.W.2d 680 (2012).

[46] *State v. Aldaco*, 271 Neb. 160, 710 N.W.2d 101 (2006), citing *Wood v. Georgia*, 450 U.S. 261, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981), and *Cuyler v. Sullivan*, 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980).

[47] *Kawa, supra* note 40.

[48] *Id.*

[49] *Id.*

[50] *Edwards, supra* note 45.

directions and that his or her counsel acted for the other client's interests or the counsel's own personal interests and against the defendant's interests, prejudice is presumed.[51] A conflict of interest must be actual, rather than speculative or hypothetical, before a court can overturn a conviction because of ineffective assistance of counsel.[52]

Here, there was no motion to withdraw or motion to disqualify regarding Cotton's trial counsel. Nevertheless, upon being informed by the State of Cotton's trial counsel's potential ethical violations, the court fulfilled its duty to inquire into the potential conflict of interest. The issue was discussed by the parties' attorneys, and Cotton affirmatively waived the potential conflict of interests on the record. We first consider whether his waiver was effective. If Cotton's consent was effective, we then consider whether the court abused its discretion in accepting Cotton's waiver. If either of the preceding questions are answered in the negative, we must determine whether Cotton's trial counsel had an actual conflict of interest that adversely affected his representation of Cotton.

### (i) Additional Facts

Lindsey Redinbaugh is the mother of Labno's children. Before trial, Cotton's trial counsel identified Redinbaugh as a witness, who would testify that Labno procured the shotgun used to kill Bare. Redinbaugh was served a subpoena on July 19, 2016, to appear and testify at Cotton's trial.

The State filed a motion in limine requesting to have Redinbaugh excluded as a witness or to allow the State to inquire on cross-examination regarding her employment with Cotton's trial counsel. The State also requested that the court advise Cotton of the potential conflict of interest resulting from his trial counsel's relationship with Redinbaugh.

---

[51] See *id.*

[52] *Id.*

The State's motion in limine alleged the following facts: Redinbaugh was hired by Cotton's trial counsel on approximately July 22, 2016; Redinbaugh and Cotton's trial counsel had discussed Matthew Krisel's statements to law enforcement; on July 29, while Krisel was being deposed by Cotton's trial counsel, Redinbaugh sent Krisel two messages on social media accusing him of "'snitching'" and discouraging him from doing so; Redinbaugh was arrested that day for witness tampering, and her cell phone was seized; Cotton's counsel informed a deputy Douglas County Attorney that Redinbaugh's cell phone may contain attorney work product and that he intended to represent Redinbaugh on the tampering charges.

In the motion in limine, the State also expressed concerns that Cotton's attorney may have aided Redinbaugh in witness tampering and either inappropriately discussed this case with Redinbaugh or allowed her access to case material, in violation of discovery rules. Cotton's trial counsel's response to the motion in limine does not appear in the record.

At the hearing on the motion, in Cotton's presence, the State alleged that Cotton's trial counsel had requested that the parties stipulate to not calling Redinbaugh as a witness and stated that "the concern or the appearance of it is, is that [Cotton's trial counsel] is now getting out of calling a material witness on behalf [of Cotton] to save himself from any ethical problems." Cotton's trial counsel responded that he had informed the State he did not intend to call Redinbaugh at the deposition of Krisel based on trial strategy. Cotton's trial counsel also stated that he had conferred with counsel for discipline and Cotton and that he and Cotton believed that it was in Cotton's best interests for him to continue representing Cotton.

There were also two versions of a local newspaper article which concerned the situation between Cotton's trial counsel and Redinbaugh entered into evidence. The record does not establish that Cotton read the articles.

The court then questioned Cotton about the motion. Upon the court's inquiry, Cotton stated that he had read the State's motion in limine, had discussed it with his trial counsel, had been able to ask his trial counsel any questions that he had about the motion in limine, had read his trial counsel's response to the State's motion in limine, and understood the potential ethics violations the State had raised concerning his attorney and their implications. Then, the following colloquy between the court and Cotton occurred: "THE COURT: Okay. Do you choose to go forward with [your trial counsel] as your counsel? [Cotton]: I do. THE COURT: All right. And do you wish to go to trial today? [Cotton]: Yes, sir."

### (ii) Cotton's Waiver Was Effective

[26,27] A waiver is the voluntary and intentional relinquishment of a known right, privilege, or claim, and may be demonstrated by or inferred from a person's conduct.[53] There is no formalistic litany required to establish that a waiver was knowingly and intelligently made; instead, when considering whether a defendant voluntarily, knowingly, and intelligently waived his or her right to counsel, we review the totality of the circumstances appearing in the record.[54] A voluntary waiver, knowingly and intelligently made, must affirmatively appear from the record, before a court may conclude that a defendant has waived a right constitutionally guaranteed or granted by statute.[55]

[28,29] In determining whether a defendant's waiver of a statutory or constitutional right was voluntary, knowing, and intelligent, an appellate court applies a clearly erroneous standard of review.[56] Under a clearly erroneous standard of review,

---

[53] *State v. Qualls*, 284 Neb. 929, 824 N.W.2d 362 (2012).

[54] See *id.*, citing *State v. Figeroa*, 278 Neb. 98, 767 N.W.2d 775 (2009).

[55] *Id.*

[56] *Id.*

we do not reweigh the evidence, but we decide the ultimate question independent of the trial court's ruling.[57]

First, Cotton asserts that his waiver was per se ineffective, because it did not comply with Neb. Ct. R. of Prof. Cond. § 3-501.7(b)(4), which requires an attorney to obtain "informed consent, confirmed in writing" from a client when there is a concurrent conflict of interest.

The Nebraska Rules of Professional Conduct govern the ethical duties and restrictions of attorneys in Nebraska. Conversely, a defendant's right to counsel free of conflicting interests, and the waiver thereof, is governed by the state and federal Constitutions. Accordingly, while Cotton's trial counsel's alleged failure to obtain written consent may be relevant in disciplinary proceedings, it is not relevant to Cotton's waiver before the court.

Second, Cotton asserts that he could not effectively waive the conflict of interest, because his trial counsel's conflict was personal, which prevented him from giving detached advice.

Though it is conceivable that any advice from Cotton's trial counsel to Cotton concerning the waiver was tainted with self-interest, the record contains an extensive dialogue between Cotton and the court. Cotton admitted that he had personally reviewed the State's motion in limine and that he was in court during the hearing. Accordingly, Cotton was aware of the factual basis for the conflict of interest and the State's concerns about the impact that Cotton's trial counsel's conflicts might have on his defense. Cotton also stated that he was able to ask his counsel any questions he had about the situation. While it is possible that Cotton's trial counsel was not honest with Cotton, Cotton was aware of the situation and had reason to view his trial counsel's statements with skepticism. Nevertheless, Cotton affirmatively stated on the record that he

---

[57] See, *State v. Pullens*, 281 Neb. 828, 800 N.W.2d 202 (2011); *Jacob North Printing Co. v. Mosley*, 279 Neb. 585, 779 N.W.2d 596 (2010), *overruled on other grounds, Heckman, supra* note 40.

wished to proceed to trial with his counsel. Therefore, we hold that Cotton made a knowing and intelligent waiver of the conflict of interest on the record.

### (iii) Court Did Not Abuse Its Discretion in Accepting Cotton's Waiver

[30,31] When determining whether or not to disqualify a defense counsel, the court must balance two Sixth Amendment rights: (1) the defendant's right to be represented by counsel of choice and (2) his or her right to a defense conducted by an attorney who is free of conflicts of interest.[58] The U.S. Supreme Court has also recognized an independent interest of the courts in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.[59] Whether a conflict of interest justifies the disqualification of defense counsel is a matter committed to the discretion of the trial court.[60]

Here, where Cotton effectively waived his right to proceed with counsel free of any conflicts of interest, we begin by considering whether his trial counsel had an actual conflict of interest or a showing of a serious potential for conflict, which would be required to overcome the presumption in favor of Cotton's choice of counsel.

[32] We have broadly defined the phrase "actual conflict" to include any situation in which a defense attorney faces divided loyalties such that regard for one duty tends to lead to disregard of another.[61] An actual conflict may arise from concurrent representation, subsequent representation, or a personal conflict held by counsel.[62] Accordingly, if a defense counsel acts

---

[58] *State v. Ehlers*, 262 Neb. 247, 631 N.W.2d 471 (2001), *overruled on other grounds, Heckman, supra* note 40.

[59] *Id.*

[60] See *State v. McGuire*, 286 Neb. 494, 837 N.W.2d 767 (2013).

[61] *Edwards, supra* note 45.

[62] See, § 3-501.7; *McGuire, supra* note 60; *Edwards, supra* note 45.

or refrains from acting at trial in a manner that is inconsistent with the defendant's interests based on the preceding sources of conflicts, the defense counsel actively represents conflicting interests.[63]

[33,34] The seriousness of any potential conflict of interest depends on its likelihood and dimensions.[64] When weighing the interests at stake, courts generally give substantial weight to defense counsel's representations regarding conflicts of interest.[65]

Cotton's trial counsel had disclosed that the reason for calling Redinbaugh as a witness was to support Cotton's allegation that Labno, not himself, had acquired the shotgun used in the shooting and to attack Labno's credibility, who claimed he had not procured the gun. While Labno's testimony supported the State's theory of the case, the testimony of the State's primary witness—Burnette—would have been wholly unaffected by the source of the gun used in the shooting. Accordingly, the evidence presented to the trial court did not support a conclusion that the failure to call Redinbaugh was per se an actual conflict of interest.

However, the jury's determination of whether or not Cotton acted in self-defense was based solely on the credibility of Cotton and the witnesses to the shooting. In a case dependent on witness credibility, any witness that could strengthen the defendant's credibility and undermine a State witness' credibility could be in the defendant's interest to call. Accordingly, Cotton's trial counsel's decision not to call Redinbaugh, in light of the ethical violations by Cotton's trial counsel that the court determined she would be subject to cross-examination on, did support a conclusion that his actions represented a potential conflict of interest.

---

[63] See *Edwards, supra* note 45.

[64] *Ehlers, supra* note 58, citing *Wheat v. United States*, 486 U.S. 153, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988).

[65] *Id.*

Nevertheless, we conclude that Cotton's trial counsel's potential conflict of interest was not a serious one. As mentioned above, the State's case rested primarily on the credibility of Burnette, not Labno. The trial court had no reason to believe that Redinbaugh would absolutely be called to testify at trial or that her testimony would have made a significant impact, especially in light of the defense's cell phone record evidence that also undermined Labno's testimony that he did not leave his apartment during the early morning of August 7, 2015. Further, Cotton's trial counsel stated that he had informed the State that Redinbaugh would not be called as a witness, based on trial strategy, before the issue of witness tampering arose, which the State did not dispute.

Because of the substantial weight that Cotton's trial counsel was entitled to on this testimony, the evidence presented to the court did not support a finding that Cotton's trial counsel's potential conflict of interest was serious. Accordingly, the presumption in favor of Cotton's right to choose his own counsel after waiving the conflict of interest could not be overcome. Therefore, the court did not abuse its discretion in accepting Cotton's waiver of the conflict of interest. This assignment of error is without merit.

### (b) Cotton Cannot Show Prejudice From His Trial Counsel's Decision Not to Call Redinbaugh as Witness

Related to the preceding section, Cotton argues that his trial counsel was ineffective for failing to call Redinbaugh as a witness. Again, he alleges that she would have testified that Labno left his apartment prior to the shooting to procure the shotgun used to shoot Bare. He argues that he was prejudiced because the testimony would have supported his credibility and undermined Labno's credibility, which was essential because his claim of self-defense hinged on who brought the shotgun into the apartment.

The State argues that the only material fact in dispute is whether Cotton acted in self-defense, and the fact of who brought the shotgun to the house had no bearing on that fact.

As discussed above, while witness credibility was paramount to determining whether or not Cotton acted in self-defense, the State's case rested primarily on Burnette's testimony of the shooting, not Labno's. As Cotton argues, his claim of self-defense is largely based on who brought the gun into the apartment during the dispute with Bare. However, as the State argues, whether Cotton or Labno procured the gun is largely irrelevant to who possessed the gun at the time of the shooting. Burnette's testimony established that Cotton possessed the gun before any altercation with Bare began and maintained possession of the gun until Cotton ultimately shot Bare.

Accordingly, assuming without deciding that Cotton's trial counsel's decision to not have Redinbaugh provide the testimony Cotton alleges at trial was deficient, Cotton cannot prove a reasonable probability that the outcome of the proceedings would have been different if Redinbaugh had testified as alleged. Because Cotton cannot show that he was prejudiced by his trial counsel's failure to call Redinbaugh as a witness, this assignment of error is without merit.

### (c) Cotton Waived Right to Request Mistrial Regarding Labno's Testimony

Cotton contends that his trial counsel was ineffective for failing to request a mistrial when Labno appeared at trial after being declared unavailable and having a portion of his deposition read into the record. He asserts that his trial counsel effectively admitted deficient performance on the record by expressing uncertainty on how to proceed. Cotton also asserts that his decision not to request a mistrial was invalid because of his trial counsel's admission. He argues that he was prejudiced, because Labno's testimony received undue influence by being presented to the jury twice and the State had the opportunity to corroborate Labno's deposition testimony.

The State argues that Cotton's trial counsel's performance was not defective but, instead, represented legitimate trial strategy. Further, it contends that Cotton cannot complain that his counsel did not request a mistrial, because Cotton consented to Labno's testimony.

### (i) Additional Facts

On the fourth day of trial, the State informed the court that it had subpoenaed Labno to testify but that he had failed to appear. Accordingly, it requested that Labno be declared an unavailable witness and asked that it be allowed to read his deposition into evidence.

In support of the request, the State asked the court to take judicial notice of the subpoena issued to Labno; offered the court's bench warrant for Labno, issued when he failed to appear on the first day of trial; and offered a copy of Labno's criminal record file, showing that the Omaha Police Department's homicide unit made two unsuccessful attempts to locate Labno pursuant to the court's bench warrant. The attorney appointed to represent Labno in the case testified that he had spoken with Labno earlier that day and that Labno indicated he would be present to testify at trial. However, he stated that he had heard nothing further from Labno and was currently unable to reach him.

The district court found that the State made a prima facie showing that Labno was unavailable and allowed the State to read Labno's deposition into the record. Then, with seven pages of the deposition left, the State informed the court that it had just received a note indicating that Labno had arrived at the courthouse.

The State proposed that Labno's deposition be stricken with an accompanying instruction to the jury or, alternatively, that they continue with the deposition and not have Labno testify. However, the State ultimately decided to defer to the defense's decision with how to proceed.

Cotton's trial counsel initially indicated that he was unsure of the legal stance of the case at that point and was not sure how to proceed. Cotton's trial counsel then reasoned that the two options were to allow Labno to be declared available and be permitted to testify or to move to strike Labno's deposition testimony and move for a mistrial because the jury would not be able to disregard the deposition testimony. The court then determined that the State could proceed with Labno's live testimony, without striking the deposition, and stated that it would not declare a mistrial, but told Cotton's trial counsel that he could still object after conferring with Cotton.

After conferring with Cotton, Cotton decided to proceed with calling Labno without objection. The court then questioned Cotton further on whether he consented to proceeding without objection. Cotton stated that he had been in the courtroom while the situation was discussed and then the situation was again relayed to him. At that point, the court presented Cotton with the following question: "Do you . . . want a mistrial or do we want to keep going and allow . . . Labno to take the stand and start from the beginning?" Cotton stated that he understood the question, and then his trial counsel stated that they wished to proceed. Nothing in the record indicated that Cotton disagreed with his trial counsel's final confirmation.

The jury was brought back in, and the court informed it that Labno had just arrived to testify. The court informed the jury that Labno would now take the stand and that while the information might be repetitive, it was its job to decipher and deal with that information.

### (ii) Analysis

[35] A mistrial is properly granted in a criminal case where an event occurs during the course of trial that is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial.[66] The defendant must prove that the alleged error

---

[66] *State v. McCurry*, 296 Neb. 40, 891 N.W.2d 663 (2017).

actually prejudiced him or her, rather than creating only the possibility of prejudice.[67]

We reject Cotton's assertion that his trial counsel's statements on the record constituted an admission of deficient performance. While Cotton's trial counsel initially expressed that he was unfamiliar with how to proceed in this novel situation, the record shows that he had a clear grasp of the situation and the basis for a mistrial. His statements on the record indicate that his decision of whether to proceed with Labno's live testimony or move to strike Labno's deposition testimony and request a mistrial was based on trial strategy, rather than deficient performance. Accordingly, the record is insufficient to determine whether such strategy itself amounted to a deficient performance.

[36] Nevertheless, such an examination is unnecessary, because Cotton personally consented to proceeding with Labno's live testimony. A defendant has a fundamental constitutional right to a fair trial.[68] Accordingly, the principles required to waive such a right, as discussed above, apply with full force here. The record shows that Cotton admitted listening to the full discussion of the situation and each attorney's and the court's proposition of how to proceed and the legal basis supporting the decision. He also had the opportunity to confer with his trial counsel on how to proceed. Even though his trial counsel may not have understood the exact basis for moving for a mistrial or to strike Labno's deposition testimony, the record shows, as mentioned above, that his trial counsel understood the basis for a mistrial and that it was an option here.

[37] Cotton stated affirmatively on the record that he understood that he was being asked whether he wanted a mistrial or to allow Labno to provide live testimony. While it was Cotton's trial counsel who ultimately answered the question, as stated above, consent may be inferred by a defendant's

---

[67] *Id.*

[68] See *State v. Johnson*, 298 Neb. 491, 904 N.W.2d 714 (2017).

actions.[69] Based on the circumstances here, Cotton's failure to protest his trial counsel's consent to proceed with live testimony was effective to provide consent to his trial counsel's statement. A defendant who has been fully informed of the constitutional right to testify may not acquiesce in his or her counsel's advice that he or she waive that right, and then later claim that he or she did not voluntarily waive such right.[70] Therefore, this assignment of error is without merit.

### (d) Prosecutorial Misconduct

[38] When considering a claim of prosecutorial misconduct, we first consider whether the prosecutor's acts constitute misconduct.[71] A prosecutor's conduct that does not mislead and unduly influence the jury is not misconduct.[72] But if we conclude that a prosecutor's acts were misconduct, we consider whether the misconduct prejudiced the defendant's right to a fair trial.[73] Prosecutorial misconduct prejudices a defendant's right to a fair trial when the misconduct so infected the trial that the resulting conviction violates due process.[74] Before it is necessary to grant a mistrial for prosecutorial misconduct, the defendant must show that a substantial miscarriage of justice has actually occurred.[75]

### (i) Prosecutor's Statements Regarding Burnette's Testimony in Closing Arguments

Cotton argues that the court erred in denying his motion for new trial based on prosecutorial misconduct. Cotton contends

---

[69] See *Qualls, supra* note 53.

[70] See *State v. Rhodes*, 277 Neb. 316, 761 N.W.2d 907 (2009).

[71] See *Johnson, supra* note 68.

[72] *Id.*

[73] *State v. Gonzales*, 294 Neb. 627, 884 N.W.2d 102 (2016).

[74] *Id.*

[75] *Id.*

that the prosecutor's statement in his rebuttal closing argument—that Burnette did not testify that Bare was advancing toward Cotton when Cotton shot Bare—was improper, because the evidence showed otherwise. He also assigns error to his trial counsel's failure to object to the prosecutor's statement and his failure to request a mistrial, to the extent that his claim of prosecutorial misconduct is prejudiced. Cotton argues the prosecutor's statement prejudiced him by mischaracterizing a material fact when the State's case was not strong and by preventing his counsel from responding.

The State admits that the statement was not entirely accurate but argues that it did not amount to misconduct, because the evidence adduced from Burnette was conflicting. It also argues that Cotton was not prejudiced, because his attorney rebutted a similar statement made by the prosecutor in the initial closing argument, the prosecutor admitted in the rebuttal closing argument that he could be wrong about what Burnette said, and the jury was instructed that statements by the attorneys were not evidence.

### a. Additional Facts

On direct examination, Burnette responded to a question by saying that "he" stepped forward and then Bare said, "If you're going to shoot me — if you're going to hold the gun to me, then you better fucking shoot me." However, in that answer, Burnette had referred to both Cotton and Bare, which made it unclear as to who had stepped forward. Later in her direct testimony, Burnette responded, "No," when asked, "Right before [Cotton] shot [Bare], did you see [Bare] make any motion or movement towards [Cotton]?" Then, on cross-examination, Burnette clarified that Bare did take a step toward Cotton a second or two before making his statement and that Bare was shot right after making the statement.

During closing arguments, the parties made the following respective comments about Burnette's testimony, regarding whether or not Bare had approached Cotton before being shot:

[State's initial closing argument]: . . . But most importantly, what does [Labno] tell you about the actions of . . . Bare? That . . . Bare did not advance at him. Never. Never advanced to . . . Cotton, which is consistent with [the testimony of] Burnette. . . .

. . . .

[Cotton's closing argument]: [The prosecutor] says [Bare] didn't move forward. But really, on cross, it was brought out that [Bare] did move forward. In fact — and that's why I said even if you think everything [Burnette] did say was true, what [Burnette] said is that [Cotton] and [Bare] were about four to five feet from each other, well within striking distance. [Cotton] motioned, asked [Bare] to go into the apartment, and then [Bare] moved forward and said, If you have a gun you better use it, and that was all within one to two seconds of the shot.

. . . .

[State's rebuttal argument]: . . . I completely disagree that . . . Burnette said [Bare] moved forward . . . . And if I'm wrong, I'm wrong. Labno didn't say it. Burnette didn't say that. But that's your responsibility. Go back [and] look at your notes. That's why you have them.

### b. Cotton Failed to Preserve Issue of Prosecutorial Misconduct and Prosecutor's Statement Did Not Constitute Plain Error

[39] One may not waive an error, gamble on a favorable result, and, upon obtaining an unfavorable result, assert the previously waived error.[76] Accordingly, a party who fails to make a timely motion for mistrial based on prosecutorial misconduct waives the right to assert on appeal that the court erred in not declaring a mistrial due to such prosecutorial misconduct.[77]

---

[76] *State v. Herrera*, 289 Neb. 575, 856 N.W.2d 310 (2014).

[77] *State v. Smith*, 292 Neb. 434, 873 N.W.2d 169 (2016).

While Cotton filed a motion for new trial after his conviction, he failed to preserve the issue of prosecutorial misconduct for appellate review, because he failed to object and make a timely motion for a mistrial.

[40] When a defendant has not preserved a claim of prosecutorial misconduct for direct appeal, we will review the record only for plain error.[78] Plain error exists where there is an error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of a litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process.[79]

Based on our discussion in the following section, we conclude that the prosecutor's statement did not amount to plain error, because Cotton was not prejudiced to the extent that leaving it uncorrected would amount to a miscarriage of justice. Therefore, the trial court did not err in overruling Cotton's motion for new trial based on prosecutorial misconduct.

### c. Cotton Cannot Show Prejudice by Trial Counsel's Failure to Object to Prosecutor's Statement

Before considering whether Cotton's trial counsel was deficient for failing to object to the prosecutor's statement, which would require a determination as to whether the prosecutor's statement amounted to prosecutorial misconduct, we consider whether Cotton was prejudiced by his trial counsel's failure to object.

As the State admits, the prosecutor's statement did mischaracterize the evidence adduced on cross-examination. However, directly after making the statement, the prosecutor admitted that he could potentially be wrong and that the members of the jury needed to refer to their notes to resolve the factual

---

[78] *State v. Dubray*, 289 Neb. 208, 854 N.W.2d 584 (2014).

[79] *State v. Robbins*, 297 Neb. 503, 900 N.W.2d 745 (2017).

dispute. Further, as the State acknowledged, this statement responded to Cotton's trial counsel's response to a similar contention that the prosecutor made in its initial closing argument. This back-and-forth highlighted the importance of this fact and allowed each side to argue its position to the jury. The court instructed the jury that "[i]t is your duty to decide what the facts are" and that "[s]tatements, arguments, and questions of the lawyers for the state and [Cotton]" are not evidence.

[41] The purpose of jury instructions is to assure decisions that are consistent with the evidence and the law and to inform the jury clearly and succinctly of the role it is to play, the decisions it must make, and to assist and guide the jury in understanding the case and considering testimony.[80] Absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at its verdict.[81]

We reject Cotton's argument that the prosecutor's statement went unanswered and had the effect of misleading the jury on a material fact. Instead, both sides were able to discuss the factual issue and the jury was instructed that the attorneys' statements were not evidence and that it was the jury's duty to decide factual matters, which the jury presumably followed. Accordingly, we do not believe the prosecutor's statement undermines the confidence in the jury's decision. Therefore, this assignment of error is without merit.

### (ii) Prosecutor's Statements About Credibility in Closing Argument Did Not Constitute Misconduct

Cotton argues that his trial counsel provided ineffective assistance by failing to object to prosecutorial misconduct in the State's closing argument regarding Cotton and his trial counsel's credibility. He argues his trial counsel was deficient, because the prosecution's characterization that Cotton

---

[80] *State v. McSwine*, 292 Neb. 565, 873 N.W.2d 405 (2016).

[81] *State v. Lester*, 295 Neb. 878, 898 N.W.2d 299 (2017).

and his trial counsel had fabricated Cotton's testimony was a personal opinion that amounted to misconduct. Cotton argues that he was prejudiced because the prosecutor's statements are accorded weight by a jury and they undercut his theory of self-defense that relied on his credibility.

The State argues that the statements were an acceptable attack on Cotton's credibility.

### a. Additional Facts

During his initial closing argument, the prosecutor began by discussing the jury instructions. Regarding jury instruction No. 22, he stated the following:

> Instruction No. 22, is the sole — you guys are the credibility — or the sole judges of a witness's credibility. The conduct and demeanor of the witness while testifying. Was . . . Burnette appropriate as she sat in this chair and told you what happened August 6th into August 7th, 2015? Did it look like it was staged? Was it scripted? Okay? How about the sources of information, including the opportunity for seeing or knowing the things about which the witness testified. . . . [Y]ou know from the testimony through . . . Burnette and . . . Labno specifically, they didn't have this entire binder. They weren't privy to everybody's statements. They didn't review depositions of every single witness, and they sure didn't sit in and listen to every single witness the State put on when we presented our case. . . . And that's important why? Because who has had everything from the day — from August of 2015, who has had everything? . . . Cotton has seen every single thing that I have. . . . How about the reasonableness or unreasonableness of the testimony of the witness? . . . Burnette, again, did it make sense? Was it corroborated by other evidence — physical evidence? Was it corroborated, more importantly, by other witnesses? . . . Labno, or — or was it just so unbelievable . . . .

Then, while discussing Cotton's testimony throughout his initial closing argument, the prosecutor stated at three points that Cotton's testimony seemed scripted. Cotton identified the first of these statements as prosecutorial misconduct. The statement, including the surroundings statements, is as follows:

Keep in min[d], he's had everything, everything the State has, for a year almost, to sit and review it. All the depositions, police reports, videos of the interviews, and he sat through all of this. . . .

. . . .

. . . He sat through all of this trial with every single witness right there in that chair. When I sat here and listened to [Cotton's] statement, I paid attention to his demeanor, and I hope you did, too. Because I thought it was unreasonable what he was talking about. It almost felt like it was a script. The defense attorney . . . : I know this is emotional for you right now, [Cotton] — and it was, Oh, cue the quivering lip. It was — there were times when [Cotton] would look at [his attorney] almost as like, What are you asking? Stay on script.

Cotton's trial counsel followed up on this during his closing argument with the ensuing statements:

Now, on Friday we all saw . . . Cotton sit here. We saw him speak from his heart and tell his account. And you know what I think we saw is that that wasn't scripted. I think what we saw is that was the opposite of scripted. I couldn't — he didn't want to just answer my questions. What he wanted to do was elaborate and elaborate and elaborate. He wanted to fill in every detail that you didn't have, even if it was inconsistent with some of the witnesses. I think it's totally obvious that the last thing . . . Cotton did was think, What am I going to say, how I'm go to go tailor it to everyone, how am I going to convince people that I have a story that makes sense that fits just enough. I think you could see that's not what he was doing.

. . . .

. . . There's no evidence that . . . Cotton had conspired to develop his script, besides the fact that he's sitting here. Other people had reviewed their depositions, as well.

. . . .

. . . I don't want you to listen to the county attorney trying to force it down your throats that . . . Cotton cannot be trusted for the sole reason that he sat here in the trial and heard other people testify.

### b. Analysis

[42,43] Public prosecutors are charged with the duty to conduct criminal trials in such a manner that the accused may have a fair and impartial trial.[82] Because prosecutors are held to a high standard for a wide range of duties, the term "prosecutorial misconduct" cannot be neatly defined.[83] Generally, prosecutorial misconduct encompasses conduct that violates legal or ethical standards for various contexts because the conduct will or may undermine a defendant's right to a fair trial.[84] While a prosecutor should prosecute with earnestness and vigor and may strike hard blows, he is not at liberty to strike foul ones.[85]

[44] A prosecutor must base his or her argument on the evidence introduced at trial rather than on matters not in evidence.[86] When a prosecutor's comments rest on reasonably drawn inferences from the evidence, he or she is permitted to present a spirited summation that a defense theory is illogical or unsupported by the evidence and to highlight the relative believability of witnesses for the State and the defense.[87] These

---

[82] *Gonzales, supra* note 73.

[83] *State v. Nolan*, 292 Neb. 118, 870 N.W.2d 806 (2015).

[84] *Id.*

[85] *Gonzales, supra* note 73.

[86] *Johnson, supra* note 68.

[87] *Nolan, supra* note 83.

types of comments are a major purpose of summation, and they are distinguishable from attacking a defense counsel's personal character or stating a personal opinion about the character of a defendant or witness.[88]

The State compares the prosecutor's comments in closing to those in *State v. Jacob*[89] and *State v. Custer*.[90] In both *Custer* and *Jacob*, we reviewed comments by prosecutors to determine if they had made improper statements on the defendants' invocation of their right to remain silent between the time they were arrested and trial.

In *Custer*, we relied on our holding in *Jacob* by equating the statements in the case to those considered in *Jacob*. We summarized the relevant statements in *Jacob*, during closing arguments, as "before the defendant testified at trial, he '"had five years to think of his answers, five years to run through all of this. Five years to prepare"' and that he had '"sat through this trial and heard every witness and every question."'"[91] Further, we stated:

> We characterized the State's remarks in *Jacob* as commenting on the defendant's credibility and as implying that "in evaluating the credibility of [the defendant's] testimony, the jury should consider that [the defendant] had the benefit of first hearing all the witnesses' testimony and had 5 years to prepare his testimony."[92]

In both cases, we concluded that the prosecutor's statements commented only on the defendant's credibility and were not an impermissible commentary on the defendant's silence. Accordingly, the prosecutor's comments in this case discussing Cotton's access to the State's evidence in

---

[88] *Id.*

[89] *State v. Jacob*, 253 Neb. 950, 574 N.W.2d 117 (1998), *abrogated on other grounds, Nolan, supra* note 83.

[90] *State v. Custer*, 292 Neb. 88, 871 N.W.2d 243 (2015).

[91] *Id.* at 111, 871 N.W.2d at 261, quoting *Jacob, supra* note 89.

[92] *Id.*, citing and quoting *Jacob, supra* note 89.

testifying were not misconduct, because they concerned only Cotton's credibility.

The prosecutor's comments in this case, however, did not stop at merely attacking Cotton's credibility based on his access to the State's evidence. Instead, the prosecutor took his comments in closing one step further by stating that Cotton seemed to use his access to the State's evidence to script his testimony and, further still, implying that Cotton's trial counsel took part in the scripting.

In *State v. Barfield*,[93] we held that the prosecutor's characterization of the defendant as a "'monster'" and strong "insinuat[ion] that defense lawyers are all liars" constituted misconduct.[94] We found such statements to be an impermissible personal expression of the defendant's culpability and implication that it is the job of defense attorneys to mislead juries, which "'denigrate[s] the legal profession in the eyes of the jury and, consequently, the public at large.'"[95]

Then, in *State v. Dubray*,[96] we also held a prosecutor's statements to be misconduct when he "characterized defense counsel as 'walking on the graves of these two people' and arguing that the victims 'deserved to die.'" We reasoned that these statements were not as bad as calling defense attorneys liars, as in *Barfield*, but were directed at defense counsel personally and not at his arguments.

[45] However, in *State v. Nolan*,[97] we differentiated a prosecutor's statements from those in *Barfield* and *Dubray* by recognizing that "'a distinction exists between arguing that a defense strategy is intended to distract jurors from what

---

[93] *State v. Barfield*, 272 Neb. 502, 723 N.W.2d 303 (2006), *disapproved on other grounds, State v. McCulloch*, 274 Neb. 636, 742 N.W.2d 727 (2007).

[94] *Id.* at 512, 514, 723 N.W.2d at 313, 314.

[95] *Id.* at 514, 723 N.W.2d at 314, quoting *U.S. v. Linn*, 31 F.3d 987 (10th Cir. 1994).

[96] *Dubray, supra* note 78, 289 Neb. at 228, 854 N.W.2d at 605.

[97] *Nolan, supra* note 83, 292 Neb. at 135, 870 N.W.2d at 822.

the evidence shows, which is not misconduct, and arguing that a defense counsel is deceitful, which is misconduct.'" There, we held that a prosecutor's "statements during closing arguments that the defense counsel was going to use 'smoke screens and mirrors' to point out inconsistencies in the evidence" were not improper, because they were distracting rather than deceitful.[98]

Here, in the context of the prosecutor's entire closing argument and Cotton's trial counsel's response, the prosecutor's references to Cotton's testimony as being "scripted" appears to be more of an imprecise substitute for lacking genuineness than an implication of perjury.

The prosecutor began by asking the jury to remember each witness' conduct and demeanor while testifying and consider if Burnette's testimony appeared "scripted" or "staged." Then the prosecutor juxtaposed Cotton's level of access to testimony and evidence in the case to that of the State's witnesses to highlight the differences in inconsistencies—asking the jury to consider whether witnesses' statements contained inconsistencies but were supported by other evidence or, instead, neatly explained away inconsistencies without corroboration. Throughout the rest of the closing, the prosecutor's references to Cotton's testimony being "scripted" also appear in the context of asking the jury to consider whether Cotton's emotions seemed genuine or his answers fit the facts too perfectly.

Cotton's trial counsel attempted to rebut the prosecutor's statements that Cotton's testimony was "scripted" by stating, instead, that Cotton spoke "from his heart" and did not "tailor" his testimony to be consistent with other witnesses. He also argued that Cotton was not any less reliable than other witnesses solely because he had access to testimony, because they could review their own depositions to ensure their statements were consistent.

---

[98] *Id.*

While we recognize that the portion identified by Cotton could be viewed differently in another context and advise prosecutors to exercise precision, the prosecutor's statements, here, were a permissible spirited summation that Cotton's knowledge of the case could have allowed him to explain away inconsistencies and allowed his attorney to ask questions that presented him the opportunity to do so—not an implication of perjury. Thus, the prosecutor's statements concerning Cotton's testimony being "scripted" did not amount to misconduct that would support this assignment of ineffective assistance of counsel for failing to object.

[46] The more concerning statement made by the prosecutor is when he stated, in reference to Cotton's testimony, "I thought it was unreasonable what [Cotton] was talking about." The Nebraska Rules of Professional Conduct state that a lawyer shall not, in trial, "state a personal opinion as to . . . the credibility of a witness . . . or the guilt or innocence of an accused."[99] In cases where the prosecutor comments on the theory of defense, the defendant's veracity, or the defendant's guilt, the prosecutor crosses the line into misconduct only if the prosecutor's comments are expressions of the prosecutor's personal beliefs rather than a summation of the evidence.[100]

In this instance, the prosecutor's comment appears to be stating his personal opinion as to the credibility of Cotton's testimony. As a result, the comment would be improper.

[47] Again, however, if we conclude that a prosecutor's acts were misconduct, we must determine whether the statement complained of was unfairly prejudicial. It is as much a prosecutor's duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.[101]

---

[99] Neb. Ct. R. of Prof. Cond. § 3-503.4(e).

[100] *Gonzales, supra* note 73.

[101] *McSwine, supra* note 80.

> Because the "average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed," "improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none."[102]

Nevertheless, whether prosecutorial misconduct is prejudicial depends largely on the context of the trial as a whole.[103]

[48] In determining whether a prosecutor's improper conduct prejudiced the defendant's right to a fair trial, we consider the following factors: (1) the degree to which the prosecutor's conduct or remarks tended to mislead or unduly influence the jury; (2) whether the conduct or remarks were extensive or isolated; (3) whether defense counsel invited the remarks; (4) whether the court provided a curative instruction; and (5) the strength of the evidence supporting the conviction.[104]

Here, the prosecutor's personal opinion, based on the nature of his position, certainly carried some weight with the jury. However, the prosecutor's comment was made within a broad discussion about the credibility of Cotton's testimony, rather than as a punctuated stand-alone declaration. Further, the prosecutor did not state that he believed Cotton was being untruthful and he did not call Cotton a liar. Thus, the weight that we accord to the comment is minimal. Also weighing in favor of finding prejudice are the facts that Cotton's trial counsel did not invite the error and that no specific curative instruction was provided. The general instructions that the attorney's statements were not evidence and that the jury is the sole judge of credibility, however, do substantially negate the impact of the related factor.

---

[102] *Id.* at 584, 873 N.W.2d at 418.

[103] *McSwine, supra* note 80.

[104] *Id.*

On the other hand, the prosecutor's comment occurred only once in his closing argument and did not inundate the trial. Also, the evidence of Cotton's guilt was substantial. Cotton admitted that he shot and killed Bare. Burnette testified that she heard Cotton state that he had a round in the gun and was going to use it and that when Bare said, "[I]f you're going to hold the gun to me, then you better fucking shoot me," Cotton shot Bare. Labno testified that he was unsure if Bare advanced at Cotton, but he stated that Bare did not charge him and that just before the shooting, Bare said something like, "If you pull a gun, you better use it . . . ."

Because the statement was not exceedingly prejudicial or pervasive and the weight of the evidence supported the convictions, we find that the prosecutor's comment did not deprive Cotton of his right to a fair trial. Therefore, this assignment of error is without merit.

### (iii) Cotton Cannot Show Prejudice From Trial Counsel's Failure to Object to Prosecutor's Asking Burnette Whether Bare Had Children

Cotton argues that his trial counsel was ineffective for failing to object to the prosecutor's asking Burnette if Bare had children. He argues that such questions were misconduct, because they were irrelevant to the case and served only to garner sympathy for the victim and excite the jurors' passions against him, which prejudiced him by harming his self-defense case.

The State argues that regardless of whether Cotton's counsel should have objected to the questions or whether the questions were improper, Cotton cannot show prejudice, because the testimony about Bare's having children was cumulative of Cotton's own testimony.

We agree with the State that Cotton cannot show any prejudice from the prosecutor's questions when Cotton also testified that Bare had three children. The evidence that Cotton

complains of was properly before the jury, so he cannot show that cumulative evidence of the same fact created a reasonable probability of a different outcome.[105] Therefore, this assignment of error is without merit.

### (e) Trial Counsel's Decision to Introduce
### Faye's Deposition Cannot Be
### Resolved on Direct Appeal

Cotton argues that his trial counsel's performance was deficient for entering Faye's deposition into evidence, because it included harmful evidence that would otherwise have been inadmissible.

The State argues that Cotton's trial counsel's performance was not deficient, because the deposition included beneficial testimony, and that Cotton cannot show prejudice, because the harmful testimony he identified was cumulative.

The decision of whether to call a witness, or present a witness' deposition, is a matter of trial strategy. When the ineffective assistance of counsel at issue could involve trial strategy, we have generally found a trial record reviewed on direct appeal to be insufficient for adequate review, because it does not tell us the reasons defense counsel tried the case in a particular manner.[106] In this matter, we, too, find this assignment of error cannot be resolved on direct appeal; however, Cotton has made sufficient allegations of deficient conduct.

### (f) Cotton Cannot Show Prejudice
### From Trial Counsel's Failure to
### Cross-Examine Dr. Erin Linde

Cotton argues that his trial counsel's performance was deficient, because he did not cross-examine Dr. Erin Linde, the forensic pathologist who performed the autopsy on Bare, about the methamphetamine, amphetamine, "THC," and fentanyl found in Bare's blood. He argues that he was prejudiced

---

[105] See *State v. Reichert*, 242 Neb. 33, 492 N.W.2d 874 (1992).

[106] See *State v. Rocha*, 286 Neb. 256, 836 N.W.2d 774 (2013).

because his trial counsel's decision to not cross-examine Dr. Linde removed an opportunity to remind the jury of these facts.

Cotton's trial counsel elicited testimony from Burnette that she witnessed Bare injecting methamphetamine after they returned to Bare's mother's house on the morning of the shooting. On direct examination, Dr. Linde testified that as a result of Bare's blood transfusion after the shooting, she was able to test only Bare's heart for controlled substances and that the amount of drugs a person has taken or when they were taken cannot be determined by testing in the heart.

Cotton does not allege that his trial counsel could have elicited any additional, beneficial facts from Dr. Linde. Cotton's trial counsel's decision to not have Dr. Linde merely reiterate her testimony that Bare tested positive for certain controlled substances does not create a reasonable probability that the outcome of the proceedings would have been different, especially when his trial counsel did elicit stronger testimony on the subject from another witness. Therefore, this assignment of error is without merit.

### (g) Additional Claims of Ineffective
### Assistance of Counsel

Cotton argues that his trial counsel was ineffective on four additional bases: (1) allowing an unlicensed attorney to participate in the trial and engage in the practice of law; (2) not having trial counsel's mother, a licensed attorney, sit second chair as trial counsel promised; (3) ineffectively selecting a jury; and (4) ineffectively failing to discover exculpatory evidence. Cotton further argues that while such claims cannot be resolved on the current record, he has sufficiently alleged deficient conduct.

The State agrees that the first two claims cannot be resolved on the present record, but that Cotton has made sufficient allegations of deficient conduct. However, the State argues that the second two claims were not raised with sufficient particularity.

At the sentencing hearing, Cotton stated that his trial counsel had promised him that the fees he paid to his trial counsel were to retain both his trial counsel and his trial counsel's mother, a licensed attorney, to be present at his trial. Cotton stated further that his trial counsel's mother was present at his initial meeting with his trial counsel. Cotton also stated that rather than his trial counsel's mother appearing at his trial, another individual, who was not a licensed attorney, sat second chair at his trial and participated in jury selection.

We agree with the parties that Cotton has stated his claims of ineffective assistance of counsel—regarding an unlicensed attorney participating in voir dire and his trial counsel's mother not sitting second chair at trial—with enough particularity to allege deficient conduct and for us to determine that an evidentiary hearing would be required to resolve the claims.

However, Cotton does not identify with specificity how his trial counsel was ineffective in selecting a jury or what exculpatory evidence he failed to discover. Such broad assertions are not sufficient to allege deficient conduct.[107]

## V. CONCLUSION

Cotton's claim that there was insufficient evidence to support the verdicts is without merit. None of Cotton's claims of trial court error have merit. Cotton's motion for new trial for prosecutorial misconduct was properly denied. Any claim of ineffective assistance of counsel is either affirmatively disproved by the record, not sufficiently presented for our review, or not able to be reviewed on the record before us. Accordingly, Cotton's convictions are affirmed.

AFFIRMED.

WRIGHT and KELCH, JJ., not participating.

---

[107] See *State v. Abdullah*, 289 Neb. 123, 853 N.W.2d 858 (2014).