IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

STATE V. PELC

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

DARRIN E. PELC, APPELLANT.

Filed April 2, 2019.    No. A-18-540.

Appeal from the District Court for Boyd County: MARK D. KOZISEK, Judge. Affirmed.

Bradley A. Ewalt, of Ewalt Law Office, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

MOORE, Chief Judge, and RIEDMANN and BISHOP, Judges.

MOORE, Chief Judge.

## I. INTRODUCTION

Darrin E. Pelc appeals from his convictions in the district court for Boyd County, following a jury trial, for strangulation, terroristic threats, and first degree false imprisonment. The district court found Pelc was a habitual criminal as defined by Neb. Rev. Stat. § 29-2221 (Reissue 2016) and imposed concurrent sentences of a mandatory minimum of 10 years in prison and a maximum of 14 years. On appeal, Pelc claims prosecutorial misconduct, challenges certain questioning by the prosecutor, asserts the court should have instructed the jury on self-defense, challenges the sufficiency of the evidence for his convictions and the court's finding that he was a habitual criminal, and raises various claims of ineffective assistance of trial counsel. Finding no error, we affirm.

## II. BACKGROUND

The charges in this case arose out of an incident that occurred between Pelc and his girlfriend, Hebbie Snyder, on the evening of April 9, 2017. On May 17, the State filed an information in the district court, charging Pelc with strangulation in violation of Neb. Rev. Stat. § 28-310.01 (Reissue 2016), a Class IIIA felony; terroristic threats in violation of Neb. Rev. Stat. § 28-311.01 (Reissue 2016), a Class IIIA felony; first degree false imprisonment in violation of Neb. Rev. Stat. § 28-314 (Reissue 2016), a Class IIIA felony; and third degree domestic assault in violation of Neb. Rev. Stat. § 28-323 (Reissue 2016), a Class I misdemeanor. The State also alleged that Pelc was a habitual criminal under § 29-2221.

Pelc filed a motion for disclosure of intention to use evidence of other crimes, wrongs, or acts pursuant to Neb. Rev. Stat. § 27-404 (Reissue 2016). At the hearing on this motion, the State expressed no intent to offer such evidence, and the district court ordered that the State was prohibited from adducing such evidence.

At the start of the jury trial, held on February 28 and March 1, 2018, the State dismissed the third degree domestic assault charge. The State presented testimony from the victim, a person contacted by the victim shortly after the incident, and various law enforcement officers who investigated the incident. The district court received into evidence numerous photographs documenting Snyder's injuries following the incident. Pelc presented testimony from two witnesses about the victim's character and copies of his medical records following the incident.

In April 2017, Snyder and her three children were living with Pelc, whom Snyder was dating, in Pelc's farmhouse in Boyd County. Pelc and Snyder both worked at a "mechanic shop" in Butte, Nebraska.

On the evening of April 9, 2017, Pelc and Snyder left the farmhouse in Pelc's vehicle. Pelc was driving, and he told Snyder, who was in the front passenger seat, to "start talking." Snyder testified that when she asked Pelc what he wanted her to talk about, he "started driving like a maniac going back and forth on the road." When Snyder asked him to stop and let her out of the vehicle, he again told her to "[s]tart talking," and upon further inquiry, he told her to "tell the truth." According to Snyder, Pelc would not stop the vehicle, kept repeating himself and screaming at her, and "just kept driving real crazy."

Pelc continued to drive, and at some point they passed the shop. When they reached a gravel road, Snyder jumped out of the moving vehicle and rolled into a ditch full of water. She testified that the vehicle was moving "pretty fast" at that point, but she jumped out because Pelc would not stop, was screaming at her, and would not "quit driving crazy." Pelc stopped the vehicle, got out, and told Snyder to get back inside the vehicle. When Snyder refused, Pelc told her that if she did not get back in the vehicle, he was going to drown her. Snyder testified that this "scared the shit out of [her]" because she thought he might actually drown her based on the tone of his voice and his actions up to that point. Snyder got back in the vehicle and tried to drive off without Pelc, but he stopped her and told her "to never make a stupid move like that again" or he would kill her. Snyder testified that she felt "very scared" at that point.

After that, Pelc continued "driving like crazy," and every time Snyder tried to get out of the vehicle again, Pelc would "smack [her] or hit [her] or something" and prevent her from doing

so. At some point, Pelc told Snyder that "he knew where all the holes were and that [she] was next," which she took to mean that he "had somewhere to bury her." Snyder testified that this remark scared her. According to Snyder, Pelc punched her several times in the face, the ribs, and the gut while they were driving around. At one point when Snyder reached for the door handle, Pelc "jumped on top [her]" and choked her, impeding her ability to breathe. Snyder testified that Pelc let go of her neck after a few seconds, punched her again, and told her to "stop faking it." Snyder testified that she "seriously thought that was going to be the last night of [her] life."

They continued to drive, passing through Spencer driving toward O'Neill, Nebraska, but Snyder testified that she was certain the injuries inflicted on her by Pelc occurred "between Butte and Spencer on gravel roads." At some point, Snyder opened the passenger door to the vehicle and jumped out again. As she did so, Pelc grabbed her hoodie and her hair, so that a big chunk of her hair was ripped out when she jumped. After that, Snyder took off running the other direction, and although Pelc tried to turn around and drive after her, he ended up rolling the vehicle. Snyder kept running and flagged down another vehicle, but when she got into the back seat, she saw that Pelc was already in the front passenger seat. Snyder asked the driver of that vehicle to call 911 but he told her he did not have a phone. The driver took them to the shop in Butte, and although Snyder asked him to take her somewhere else, he refused. Snyder exited the vehicle on the opposite side from Pelc, and she ran across the highway to a house, where one of the residents, Brandee Reiser, called 911 for Snyder.

Reiser testified that on the evening in question, she and her husband were awoken by Snyder "slamming on the door" to their house and "screaming to be let in." Reiser went to the door and Snyder, who Reiser described as "hysteric [sic]" and "panicked," asked her to call the police and explained what had happened. Reiser called the police, and her husband called another individual, who went with him to Pelc's farmhouse to retrieve Snyder's children.

Police received the call around 11:30 p.m. and deputies from the Boyd County Sheriff's Department responded to the call. When the deputies got to the Reiser residence, they spoke with Snyder, who was crying and highly upset, and one of them photographed her visible injuries, which included bruising on her leg, hands, arms, back, neck and eye. The deputies also documented a wad of hair wrapped around the drawstring of Snyder's hoodie. The deputies then transported Snyder to the sheriff's office to speak with her further. They also took a few more photographs of Snyder's bruising, which had started to show up a little bit better, before transporting Snyder and her children to a motel. That night, the deputies also investigated the scene of the vehicle rollover, where they found a clump of hair, consistent with the hair found on the drawstring of Snyder's hoodie, among the rubbish scattered outside of the vehicle. The deputies took additional photographs of Snyder the next morning.

At trial, the deputies were asked about whether bruising on Snyder's knuckles showed offensive or defensive marks. One deputy responded, "It could be, potentially, either/or." He also testified that the bruises on Snyder documented at the Reiser residence appeared to be relatively recent, although he agreed that it was possible the bruises could have been "at least six hours old." Another deputy testified that he took photographs of Snyder's hands to document bruising, but he did not know whether the marks were offensive or defensive. This deputy also testified that it was "possible" that some of the bruising observed on Snyder in the early morning hours of April 10,

2017, could have occurred prior to 9:30 p.m. on April 9. During her trial testimony, Snyder reviewed the photographs taken by the deputies and confirmed that all of the injuries shown occurred during the incident in question and that none of her injuries were preexisting. She also denied assaulting Pelc and testified that all of her injuries were defensive.

Pelc did not testify. He offered into evidence his medical records from a visit to a medical clinic on April 10, 2017, where he was treated for a laceration to his right hand and complaints of "left shoulder pain radiating into head and neck." He also offered testimony from two witnesses who were asked about Snyder's "propensity to tell the truth." One of Pelc's witnesses testified that in the three or four times she had met Snyder, she had not "caught any lies or anything;" the other testified that he did not think Snyder told the truth "all the time."

The jury found Pelc guilty of strangulation, terroristic threats, and first degree false imprisonment. The district court accepted the verdicts and scheduled an enhancement and a sentencing hearing.

During the enhancement hearing, the State offered evidence of several prior convictions for which Pelc was sentenced to a year or more of imprisonment. On May 7, 2018, the district court entered an order, finding that the State had shown sufficient evidence of three prior felony convictions in which Pelc was sentenced and committed to prison for terms of not less than 1 year each. Accordingly, the court determined that Pelc would be sentenced as a habitual criminal.

The district court imposed concurrent sentences of imprisonment for a mandatory minimum of 10 years and a maximum of 14 years on each of Pelc's three convictions. The court gave Pelc credit for 47 days of time served.

Pelc subsequently perfected his appeal to this court.

## III. ASSIGNMENTS OF ERROR

Pelc asserts, reordered, that (1) the State committed prosecutorial misconduct by asking Snyder certain questions in violation of the district court's order prohibiting Rule 404 evidence, (2) the court erred by allowing the State to ask leading questions of Snyder without first asking to treat her as a hostile witness, (3) the court erred by failing to give a self-defense jury instruction as requested by Pelc, (4) the evidence was insufficient to convict him on each of the charges, (5) the court erred in finding Pelc was a habitual criminal under § 29-2221, and (6) he received ineffective assistance of trial counsel in various regards.

## IV. STANDARD OF REVIEW

When a defendant has not preserved a claim of prosecutorial misconduct for direct appeal, an appellate court will review the record only for plain error. *State v. Cotton*, 299 Neb. 650, 910 N.W.2d 102 (2018), *disapproved on other grounds, State v. Avina-Murillo*, 301 Neb. 185, 917 N.W.2d 865 (2018).

An appellate court reviews a trial court's allowance of leading questions for an abuse of discretion. *State v. Smith*, 292 Neb. 434, 873 N.W.2d 169 (2016). A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition. *State v. Ralios*, 301 Neb. 1027, 921 N.W.2d 362 (2019).

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Savage*, 301 Neb. 873, 920 N.W.2d 692 (2018). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *State v. Savage, supra*. When judicial discretion is not a factor, whether the underlying facts satisfy the legal rules governing the admissibility of a proponent's evidence is a question of law, subject to de novo review. *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017).

Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision. *State v. Lessley*, 301 Neb. 734, 919 N.W.2d 884 (2018).

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Smith, supra*. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *Id.*

Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement. *State v. Golyar*, 301 Neb. 488, 919 N.W.2d 133 (2018). An appellate court determines as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance. *Id.*

## V. ANALYSIS

### 1. ERRORS RELATING TO PROSECUTOR'S QUESTIONING OF SNYDER

#### (a) Prosecutorial Misconduct

Pelc asserts that the State committed prosecutorial misconduct by asking Snyder certain questions in violation of the district court's order prohibiting evidence under § 27-404. Specifically, the prosecutor asked Snyder whether she was "a frequent flyer . . . one of those that's in court a lot" and whether it was also "the case with . . . Pelc" that he had "been in court a lot." Snyder replied affirmatively to all of these questions, and Pelc did not object or make a motion for mistrial.

One may not waive an error, gamble on a favorable result, and, upon obtaining an unfavorable result, assert the previously waived error. *State v. Herrera*, 289 Neb. 575, 856 N.W.2d 310 (2014). A party who fails to make a timely motion for mistrial based on prosecutorial misconduct waives the right to assert on appeal that the court erred in not declaring a mistrial due

to such prosecutorial misconduct. *State v. Cotton*, 299 Neb. 650, 910 N.W.2d 102 (2018), *disapproved on other grounds, State v. Avina-Murillo*, 301 Neb. 185, 917 N.W.2d 865 (2018). Because Pelc failed to object and make a timely motion for mistrial, he failed to preserve the issue of prosecutorial misconduct for appellate review. *Id.* Accordingly, we review the record only for plain error. See *id.* Plain error may be found on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *State v. Thompson*, 301 Neb. 472, 919 N.W.2d 122 (2018).

Public prosecutors are charged with the duty to conduct criminal trials in such a manner that the accused may have a fair and impartial trial. *State v. Cotton, supra*. Generally, prosecutorial misconduct encompasses conduct that violates legal or ethical standards for various contexts because the conduct will or may undermine a defendant's right to a fair trial. *Id.*

Prosecutorial misconduct prejudices a defendant's right to a fair trial when the misconduct so infected the trial that the resulting conviction violates due process. *State v. Gonzales*, 294 Neb. 627, 884 N.W.2d 102 (2016). Whether prosecutorial misconduct is prejudicial depends largely upon the context of the trial as a whole. *State v. Hernandez*, 299 Neb. 896, 911 N.W.2d 524 (2018). In determining whether a prosecutor's improper conduct prejudiced the defendant's right to a fair trial, an appellate court considers the following factors: (1) the degree to which the prosecutor's conduct or remarks tended to mislead or unduly influence the jury; (2) whether the conduct or remarks were extensive or isolated; (3) whether defense counsel invited the remarks; (4) whether the court provided a curative instruction; and (5) the strength of the evidence supporting the conviction. *State v. Cotton, supra*.

Prosecutors also may not inflame the jurors' prejudices or excite their passions against the accused. *State v. Hernandez, supra*. Prosecutors should not make statements or elicit testimony intended to focus the jury's attention on the qualities and personal attributes of the victim. *Id.* These facts lack any relevance to the criminal prosecution and have the potential to evoke juror sympathy and outrage against the defendant. *Id.* Further, under § 27-404(2), evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. *State v. Parnell*, 294 Neb. 551, 883 N.W.2d 652 (2016). It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id.*

Pelc argues that the prosecutor's questions about Pelc being a "frequent flyer" who had been "in court a lot" suggested that he had a past criminal history and made it more likely for the jurors to believe that he would be involved in further criminal acts, such as those with which he was charged in this case. He argues that the prosecutor's misconduct in asking these questions of Snyder prejudiced his right to a fair and impartial trial. The prosecutor's questions to Snyder arose at the start of the second day of trial. The prosecutor did not elicit any testimony about the nature of any of Pelc's prior appearances in court. These questions were part of a series of questions addressing concerns about Snyder's credibility. The questions were not invited by Pelc's attorney, but the isolated nature of this questioning weighs against a finding of prejudice. No curative instruction was provided because Pelc's attorney did not object, but again, the jury was instructed not to be influenced by sympathy or prejudice. Finally, as discussed further below, there was

significant uncontroverted evidence supporting the elements of each of the crimes tried to the jury. Having considered the relevant factors, to the extent the State's questioning was improper, it was not prejudicial and does not rise to the level of plain error.

### (b) Leading Questions

Pelc asserts that the district court erred by allowing the State to ask leading questions of Snyder without first asking to treat her as a hostile witness. Neb. Rev. Stat. § 27-611(3) (Reissue 2016) provides that leading questions, "should not be used on the direct examination of a witness except as may be necessary to develop his testimony;" however, "[w]hen a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions." The concern with the use of leading questions during direct examination is that a witness already giving favorable testimony to a party may testify to facts suggested to the witness, rather than those personally known by the witness. *State v. Smith*, 292 Neb. 434, 873 N.W.2d 169 (2016). It is usual and proper for the trial court to permit leading questions in conducting the examination of a witness who is immature; unaccustomed to court proceedings; inexperienced, agitated, terrified, or embarrassed while on the stand; and lacking in comprehension of the questions asked. *State v. Fleming*, 280 Neb. 967, 792 N.W.2d 147 (2010).

Pelc argues that there was no finding that Snyder was immature or did not understand the questions asked of her, and while there was some indication that Snyder had not cooperated with efforts to meet with the prosecution to prepare for trial, the prosecutor did not ask to treat her as a hostile witness. Pelc directs us to a number of instances where the prosecutor asked Snyder leading questions; however, because his attorney did not object, any error in allowing the evidence elicited through these questions has not been preserved for appellate review. Failure to make a timely objection waives the right to assert prejudicial error on appeal. *State v. Swindle*, 300 Neb. 734, 915 N.W.2d 795 (2018).

### 2. JURY INSTRUCTION

Pelc asserts that the district court erred by failing to give his requested self-defense jury instruction.

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Swindle, supra*.

To successfully claim one was acting in self-defense, the force used in defense must be immediately necessary and must be justified under the circumstances. *State v. Abdulkadir*, 293 Neb. 560, 878 N.W.2d 390 (2016). See, also, Neb. Rev. Stat. § 28-1409 (Reissue 2016) (concerning use of force in self-protection). A trial court must instruct the jury on the issue of self-defense when there is any evidence adduced which raises a legally cognizable claim of self-defense. *State v. Iromuanya*, 272 Neb. 178, 719 N.W.2d 263 (2006). To successfully assert the claim of self-defense, one must have a reasonable and good faith belief in the necessity of using force. *State v. Golka*, 281 Neb. 360, 796 N.W.2d 198 (2011). In addition, the force used in defense must be immediately necessary and must be justified under the circumstances. *Id.* If the trial

evidence does not support a claim of self-defense, the jury should not be instructed on it. *State v. Iromuanya, supra*.

In this case, the trial evidence did not support a claim of self-defense. Snyder and Pelc were the only witnesses to the altercation. Snyder's injuries were well-documented by law enforcement. She testified that she never assaulted Pelc and that all of her injuries resulted from the incident in question and were defensive. Despite Pelc's assertions, Snyder's testimony that the injuries on her hands were defensive was not rebutted by the testimony of the deputies who investigated the incident. One deputy agreed that the marks on Snyder's hands could have been either offensive or defensive wounds. The other deputy testified that he took certain photographs to document bruising on Snyder's hands but that he did not know if they were offensive or defensive marks. Neither deputy opined or suggested that the bruising on Snyder's hands showed offensive injuries; they simply acknowledged that they could not tell whether the wounds were offensive or defensive. Pelc's medical records show that he complained of shoulder pain, radiating into his head and neck, the following day and that he sustained a laceration to his hand, injuries that may have occurred as a result of the vehicle rollover. The evidence does not support an inference that Pelc had a reasonable and good faith belief in the necessity of using force to defend himself against Snyder. Because there was no evidence to support a claim of self-defense in this case, the district court did not err in refusing to give the requested instruction. This assignment of error is without merit.

### 3. SUFFICIENCY OF EVIDENCE

Pelc asserts that the evidence was insufficient to convict him on each of the charges.

### (a) Strangulation

"A person commits the offense of strangulation if the person knowingly or intentionally impedes the normal breathing or circulation of the blood of another person by applying pressure on the throat or neck of the other person." § 28-310.01.

Snyder testified that Pelc jumped on top of her during the incident, that he choked her, and that she could not breathe. She also testified that there was a point when he actually had his hands around her neck, that he applied pressure, and that she could not breathe. There were photographs admitted into evidence showing marks on Snyder's neck. One of the detectives testified that these marks signified "[p]ossible -- either grabbing or something around the neck."

### (b) Terroristic Threats

Pursuant to § 28-311.01:

A person commits terroristic threats if he or she threatens to commit any crime of violence:
(a) With the intent to terrorize another;
(b) With the intent of causing the evacuation of a building, place of assembly, or facility of public transportation; or
(c) In reckless disregard of the risk of causing such terror or evacuation.

- 8 -

The crime proscribed by § 28-311.01 does not require an intent to execute the threats made. *State v. Smith*, 267 Neb. 917, 678 N.W.2d 733 (2004). Likewise, it does not require that the recipient of the threat be terrorized; rather, it requires that the actor have the intent to terrorize the recipient as a result of the threat. See *State v. Saltzman*, 235 Neb. 964, 458 N.W.2d 239 (1990).

During the incident, Snyder jumped out of the vehicle at one point and rolled into a ditch full of water. Pelc stopped the vehicle, got out, and told Snyder he would drown her if she did not get back into the vehicle. Pelc told her that if she tried to leave the vehicle again he would kill her. And, at some point during the incident, he told that he knew where all the holes were, which Snyder took to mean that he had somewhere to bury her. Snyder was very scared by Pelc's words and the tone of his voice and was afraid that he was trying to kill her.

### (c) False Imprisonment

"A person commits false imprisonment in the first degree if he or she knowingly restrains or abducts another person (a) under terrorizing circumstances or under circumstances which expose the person to the risk of serious bodily injury; or (b) with intent to hold him or her in a condition of involuntary servitude." § 28-314(1).

During the incident, Pelc drove erratically. Although Snyder was able to exit the vehicle on two occasions while it was moving, Pelc thwarted her other attempts by hitting and choking her and grabbing onto her clothing and hair. And, as noted above, Pelc made various threatening statements to Snyder during the incident. Although Pelc suggests that Snyder's testimony shows that he "let her go" when she jumped out of the vehicle the second time, the record shows that Snyder continued to pull against Pelc's grip on her hair and clothing until he could no longer hold on to her.

### (d) Conclusion

In arguing that the evidence was insufficient to support his convictions, Pelc attacks Snyder's credibility and the weight of some of the evidence. However, we do not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, which are all matters are for the finder of fact. See *State v. Smith*, 292 Neb. 434, 873 N.W.2d 169 (2016). Because the jury as the trier of fact could have found all of the essential elements for strangulation, terroristic threats, and false imprisonment beyond a reasonable doubt based on the State's evidence, the evidence was sufficient to support Pelc's convictions. His assertions to the contrary are without merit.

### 4. HABITUAL CRIMINAL

Pelc asserts that the district court erred in finding Pelc was a habitual criminal under § 29-2221. He argues that his prior convictions were invalid for enhancement purposes because the State failed to prove his identity, i.e., that it was in fact Pelc who was convicted and sentenced to prison for each prior convictions used to make the habitual criminal determination.

In a habitual criminal proceeding, the State's evidence must establish with requisite trustworthiness, based upon a preponderance of the evidence, that (1) the defendant has been twice convicted of a crime, for which he or she was sentenced and committed to prison for not less than

1 year; (2) the trial court rendered a judgment of conviction for each crime; and (3) at the time of the prior conviction and sentencing, the defendant was represented by counsel or had knowingly and voluntarily waived representation for those proceedings. *State v. Jenkins*, 294 Neb. 684, 884 N.W.2d 429 (2016). In a proceeding to enhance punishment because of prior convictions, the State has the burden of proving such prior convictions by a preponderance of the evidence. *State v. Bol*, 288 Neb. 144, 846 N.W.2d 241 (2014).

The existence of a prior conviction and the identity of the accused as the person convicted may be shown by any competent evidence, including the oral testimony of the accused and duly authenticated records maintained by the courts or penal and custodial authorities. *State v. Bol, supra*. See, also, Neb. Rev. Stat. § 29-2222 (Reissue 2016) (duly authenticated copy of former judgment and commitment shall be competent and prima facie evidence of former judgment and commitment). An authenticated record establishing a prior conviction of a defendant with the same name is prima facie evidence sufficient to establish identity for the purpose of enhancing punishment and, in the absence of any denial or contradictory evidence, is sufficient to support a finding by the court that the accused has been convicted prior thereto. *State v. Dixon*, 282 Neb. 274, 802 N.W.2d 866 (2011).

Pelc argues that that the State did not prove his identity "as the individual sentenced and committed to prison for each of the prior convictions used" by the district court to make the habitual criminal determination, "such as through a fingerprints expert or other testimony." Brief for appellant at 24. As set forth above, this is not what is required. The State offered certified copies of several prior convictions for which an individual named "Darrin Pelc" or "Darrin E. Pelc" was sentenced to imprisonment for a year or more, thus providing prima facie evidence sufficient to establish Pelc's identity for the purpose of enhancing punishment given the absence of any denial or contradictory evidence from Pelc. The district court determined that three of the submitted prior convictions could be used for enhancement purposes. Pelc offered no evidence to contradict the State's prima facie evidence establishing his identity for enhancement purposes, and he does not challenge any other elements of the habitual criminal determination in this case. This assignment of error is without merit.

### 5. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Pelc asserts that he received ineffective assistance of trial counsel in various regards. He is represented on direct appeal by different counsel than trial counsel. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record, otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding. *State v. Smith*, 302 Neb. 154, 992 N.W.2d 444 (2019). The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *Id.* The determining factor is whether the record is sufficient to adequately review the question. *Id.*

Appellate courts have generally reached ineffective assistance of counsel claims on direct appeal only in those instances where it was clear from the record that such claims were without merit, or in the rare case where trial counsel's error was so egregious and resulted in such a high

level of prejudice that no tactic or strategy could overcome the effect of the error, which effect was a fundamentally unfair trial. *State v. Sundquist*, 301 Neb. 1006, 921 N.W.2d 131 (2019). An ineffective assistance of counsel claim will not be addressed on direct appeal if it requires an evidentiary hearing. *State v. Nolt*, 298 Neb. 910, 906 N.W.2d 309 (2018).

When an ineffective assistance of counsel claim is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel. *State v. Sundquist, supra*. General allegations that trial counsel performed deficiently or that trial counsel was ineffective are insufficient to raise an ineffective assistance claim on direct appeal and thereby preserve the issue for later review. *Id.* An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court. *State v. Smith, supra*. An ineffective assistance of counsel claim made on direct appeal can be found to be without merit if the record establishes that trial counsel's performance was not deficient or that the appellant could not establish prejudice. *State v. Sundquist, supra*.

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Henderson*, 301 Neb. 633, 920 N.W.2d 246 (2018). To show deficient performance, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *State v. Parnell*, 294 Neb. 551, 883 N.W.2d 652 (2016). To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. Id. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *State v. Avina-Murillo*, 301 Neb. 185, 917 N.W.2d 865 (2018). The two prongs of the ineffective assistance of counsel test under *Strickland v. Washington, supra*, may be addressed in either order, and the entire ineffectiveness analysis should be viewed with a strong presumption that counsel's actions were reasonable. *State v. Taylor*, 300 Neb. 629, 915 N.W.2d 568 (2018).

Pelc specifically argues that his trial counsel was ineffective for (1) not allowing him to testify in his own defense despite his desire to do so, (2) failing to object to some of the questioning by the State, (3) failing to call certain witnesses that Pelc wanted to be called, (4) failing to produce certain mitigating evidence at trial, and (5) failing to provide enough evidence to justify a self-defense instruction.

(a) Right to Testify

Pelc argues that he wanted to testify in his defense but that his attorney did not allow him to do so. A defendant has a fundamental constitutional right to testify. *State v. Golyar*, 301 Neb. 488, 919 N.W.2d 133 (2018). The right to testify is personal to the defendant and cannot be waived by defense counsel's acting alone. *Id.*

- 11 -

Defense counsel bears the primary responsibility for advising a defendant of his or her right to testify or not to testify, of the strategic implications of each choice, and that the choice is ultimately for the defendant to make. *Id.* Defense counsel's advice to waive the right to testify can present a valid claim of ineffective assistance of counsel in two instances: (1) if the defendant shows that counsel interfered with his or her freedom to decide to testify or (2) if counsel's tactical advice to waive the right was unreasonable. *Id.*

Pelc does not argue that he was not informed of his right to testify; rather, he argues that he wanted to testify and that his attorney prevented him from doing so. In arguing that his trial counsel interfered with his freedom to testify, Pelc notes that the only witnesses called by his attorney had no independent knowledge of the events of April 9, 2017. He argues that if he had been allowed to testify "it is very possible that the testimony he provided would be enough to place reasonable doubts in the minds of the jurors." Brief for appellant at 19-20. Pelc did not waive his right to testify on the record, and the record does not reveal the details of any discussion between him and his attorney on this issue. We conclude that the record is insufficient to address this claim on direct appeal.

### (b) Questioning by State

Pelc argues that his trial counsel was ineffective for failing to object to the leading questions the prosecutor asked of Snyder on the second day of trial. Pelc cannot show a reasonable probability that he would have been acquitted absent these questions. Even if his attorney had objected to the leading questions asked of Snyder on direct examination and those objections had been sustained, the prosecutor could have elicited the same testimony from Snyder by asking her non-leading questions.

Pelc also argues that his attorney should have objected when the prosecutor asked Snyder whether Pelc was a "frequent flyer" and had been "in court a lot." He argues that this line of questioning violated the district court's pretrial ruling with respect to evidence under § 27-404 and that the information that he had been in court frequently likely had some impact on the jury's decision to convict him. Pelc cannot show he was prejudiced in this regard. The prosecutor asked Snyder these questions as part of a series of questions acknowledging issues with her credibility. To the extent that her testimony revealed that Pelc had had prior contacts with the court, it was a very brief discussion and did nothing to inform the jury as to the nature of Pelc's prior criminal history. While the failure of his attorney to object to this line of questioning may have been deficient performance, Pelc cannot show a reasonable probability that but for his counsel's failure to object to this questioning, the result of the proceeding would have been different, especially considering the overwhelming uncontroverted evidence against him.

Because Pelc cannot show prejudice with respect to his attorney's failure to object to the State's questioning of Snyder, this claim is without merit.

### (c) Failure to Call Witnesses

Pelc argues that he provided his attorney with a lengthy list of witnesses he wanted his attorney to call on his behalf. He argues that he provided a list of several individuals other than those called by his attorney, some of whom could have provided character evidence showing

Snyder had a reputation for being untruthful and some of whom would have been able to "explain away some of the injuries to Snyder." Brief for appellant at 20. He also indicates that he would have had some testimony from witnesses about his own injuries. Finally, he argues that his attorney attempted to subpoena two witnesses, Alan Holtz and Jeremy Pelc, but that his attorney never ensured that the subpoenas were served on these individuals for their testimony at trial. Other than the two individuals identified above, Pelc does not identify any other witnesses or the nature of their testimony and as such, these allegations are not sufficiently pled and we reject these claims. As to the identified witnesses, we are unable to ascertain why Pelc's attorney allegedly failed to ensure their attendance at trial. The record on direct appeal is insufficient to address this claim.

### (d) Failure to Produce Mitigating Evidence

Pelc references his attorney's cross examination of Snyder with respect to a meeting she had with the prosecutor prior to trial. He argues that there was a video tape of this meeting that "would have been enlightening in the method of coercion used to get Snyder to understand what she needed to testify about to ensure a felony" conviction, which was not offered at trial. Brief for appellant at 21. He also argues that there were other sworn statements by Snyder that were not offered, which would have raised more doubts as to her credibility. Finally, he argues that there was video evidence that one of the deputies was concerned that Snyder may have been under the influence of a controlled substance, which was not offered as evidence, nor was the deputy questioned on this issue. The decision by Pelc's attorney not to offer this evidence involves issues of trial strategy, and the record is insufficient to address this claim on direct appeal.

### (e) Self-Defense Instruction

We have determined above that the evidence presented at trial did not support a jury instruction on self-defense. Pelc argues that his attorney should have provided more evidence to justify the requested self-defense instruction. Again, this involves matters of trial strategy, and the record is insufficient to address it on direct appeal.

### VI. CONCLUSION

We find no plain error with respect to Pelc's claim of prosecutorial misconduct, and he has waived any error relating to the prosecutor's use of leading questions in questioning Snyder. The district court did not err in refusing to give the requested self-defense jury instruction or in finding that Pelc was a habitual criminal. The evidence was sufficient to support Pelc's convictions. Except for Pelc's claim that his attorney was ineffective for failing to object to certain questioning of Snyder by the prosecutor, for which he cannot show prejudice, and his claim that his attorney failed to call certain unnamed witnesses, for which he failed to sufficiently plead, the record is insufficient to address Pelc's other claims of ineffective assistance of trial counsel on direct appeal.

AFFIRMED.